**BULLETIN DISPLAYS, LLC**

v.

**REGENCY OUTDOOR ADVERTISING, INC. et al.**

**No. SACV 05–1083CJC(ANX).**

United States District Court, C.D. California.

June 6, 2006.

Laurence Jackson, Holly O. Whatley, Christa & Jackson, Los Angeles, CA, for Bulletin Displays, LLC, Plaintiff.

Michael L. Tidus, Donald E. Leonhardt, Jackson, DeMarco, Tidus & Peckenpaugh, Irvine, Jeffrey A. Tidus, David P. Crochetiere, Baute & Tidus LLP, Los Angeles, CA, for Regency Outdoor Advertising, Inc., West Hollywood Properties, LLC, Brian Kennedy and Drake Kennedy, Defendants.

CARNEY, District Judge.

**PROCEEDINGS: (IN CHAMBERS) ORDER DENYING DEFENDANT'S MOTION TO DISMISS PLAINTIFF'S COMPLAINT PURSUANT TO CALIFORNIA CODE OF CIVIL PROCEDURE SECTION 425.16 (filed 3/9/06)**

Plaintiff Bulletin Displays, LLC ("Bulletin") asserts federal RICO and antitrust claims, and state law antitrust, unfair competition and tort claims, against Defendant Regency Outdoor Advertising, Inc. ("Regency") and other Defendants, based on Defendants' alleged payment of bribes to the Mayor of Lynwood, California. Regency has filed a motion to dismiss Bulletin's Complaint pursuant to California's anti-SLAPP statute, California Code of Civil Procedure Section 425.16. Because the only conduct alleged in the Complaint that is protected under the anti-SLAPP statute is merely incidental to other alleged conduct that is not protected, Regency's motion is DENIED.

### I. Background

Regency and Bulletin are competing billboard advertising companies. Bulletin filed its Complaint in this action against Regency and various other parties on November 4, 2005, alleging that the Defendants had engaged in a scheme to bribe public officials to influence the awarding of billboard permits and contracts in the City of Lynwood, California ("the City") between 1998 and 2001. According to the Complaint, Regency and its consulting

agency, a lobbying organization called Ken Spiker and Associates ("KSA"), made cash payments to the City's Mayor, Paul Richards, and Allied Governmental Services ("AGS"), a corrupt organization associated with Richards. In exchange for Regency's payments, Bulletin alleges, Mayor Richards ensured that Regency would obtain billboard contracts with the City and prevented Bulletin from obtaining necessary permits and contracts needed to operate there. Bulletin also alleges that agents of KSA approached Bulletin on several occasions and threatened it with financial harm in an attempt to induce Bulletin to join the corrupt conspiracy.

The Complaint's specific allegations are as follows. In order to build billboards along the 105 freeway that runs through the City of Lynwood, a company must obtain two types of permits: a permit from California Department of Transportation ("Caltrans") ("Caltrans permit"), and a permit from the City ("City permit"). (Complaint, ¶¶ 13, 22.) Only one company may own any given Caltrans permit at a given time. (*Id.*, ¶ 22.)

In 1996, Caltrans issued thirteen permits to Bulletin permitting Bulletin to place thirteen billboards on private land next to the 105 freeway in Los Angeles County. (Complaint, ¶ 13.) Nine of the Caltrans permits were for locations within the City. (*Id.*) Bulletin also secured all necessary leasehold rights, easements, and other rights from the landowners of the City property containing the proposed billboard sites. (*Id.*, ¶ 15.) Between approximately 2000 and the present, Bulletin has held the only available Caltrans permits for billboard sites next to the 105 freeway in the City. (*Id.*, ¶ 22.) However, Bulletin was unable to obtain the necessary City permits, because the City refused to grant them to Bulletin until February 2005. (*Id.*, ¶ 17.) Consequently, Bulletin remained unable to use its Caltrans permits

to build billboards along the 105 freeway in the City.

Between 1998 and the present, an entity named Allied Governmental Services or Allied Government Services ("AGS"), and several individuals associated with AGS, had an agreement with Mayor Richards. (*Id.*, ¶ 20.) Under the agreement, AGS would make cash payments to Mayor Richards, who in return would issue or refuse to issue outdoor advertising permits. (*Id.*) The individuals who paid Mr. Richards on AGS' behalf were Paula Harris, Julio Naulls, and their relatives. (*Id.*) Mr. Naulls was an officer and principal of AGS. (*Id.*, ¶ 21.)

On March 13, 2000, Mr. Naulls told Mark Kudler, an officer and principal of Bulletin, that he (Mr. Naulls) could assure Bulletin that Lynwood would issue it the necessary building permits if Mr. Kudler paid him $25,000 in cash. (*Id.*, ¶ 21.) In making the statement, Mr. Naulls was acting as an agent of AGS. (*Id.*) All or a significant portion of the requested $25,000, if paid by Bulletin, was to be paid to Mayor Richards pursuant to his agreement with AGS, in exchange for Mayor Richards causing the City to approve Bulletin's proposed billboards. (*Id.*)

In or about November 2000, Mr. Richards entered into an agreement on behalf of the City with AGS. (*Id.*, ¶ 24.) Under the agreement, the City would pay AGS approximately 20 percent of any payments made to the City by any billboard advertising company. (*Id.*, ¶ 24.) The funds paid to AGS were ultimately to be paid to Mayor Richards, Ms. Harris, and Mr. Naulls. (*Id.*) The money paid to Mayor Richards was in exchange for his agreement to use his position as a City Council member and Mayor to cause the City to issue billboard permits. (*Id.*)

Also in November 2000, and after the City had entered its agreement with AGS,

Mr. Kudler was contacted by Ken Spiker, a principal of KSA. (*Id.*, ¶ 23.) Mr. Spiker told Mr. Kudler that he had spoken to members and representatives of the Lynwood City Council, and that Bulletin could obtain the necessary City permits if Bulletin was prepared to pay "Paul Richards' price" of three million dollars to the City. (*Id.*) Included in that price, Mr. Spiker stated, "would be any amounts payable to Mr. Spiker or to [KSA]." (*Id.*) Mr. Spiker further stated that he and other Defendants had threatened to bankrupt a local city by use of litigation, that he had caused the city to cave in to his demands, and that he and his "colleagues" had told the city that they had more money than they did. (*Id.*, ¶ 23.) He then stated that he, the City, and other Defendants would harm Bulletin if it did not agree to pay Paul Richards' price. (*Id.*) That threat of litigation and other steps caused Bulletin to fear that it would suffer material economic losses. (*Id.*) Between September 2000 and February 2001, Mr. Spiker had other. conversations with Mr. Kudler in which he told Mr. Kudler that the City would grant Bulletin the needed City permits if Bulletin made the requested payments. (*Id.*, ¶ 26.)

Some time after March 2000, KSA and the City entered into a joint venture whereby KSA or its agents would operate billboards in or next to the City. (*Id.*, ¶ 28.) The City was to share in the profits from the joint venture in exchange for preventing Bulletin from building within the City and annexing and rezoning land as needed to accommodate the joint venture's billboards. (*Id.*) The joint venture agreement also provided that Mayor Richards would receive payment through the City's agreement with AGS, in exchange for his agreement to use his office to cause the City to approve billboards. (*Id.*) On or about February 1, 2001, KSA sent a letter to the City setting forth the terms of the joint venture agreement. (*Id.*, ¶ 28.) In per-

forming the joint venture agreement, the City amended its ordinances to permit any billboard to be built that was approved by the City, but refused to approve any requests by Bulletin to build within the City. (*Id.*, ¶ 30.)

In June 2001, the City and AGS signed a contract providing that AGS would receive 20 percent of any amounts of money thereafter payable by billboard companies to the City, and that AGS would provide no material services or other benefit to the City in exchange for the payment. (*Id.*, ¶ 27.) AGS and Mayor Richards further agreed that Mayor Richards would receive a portion of those payments in exchange for causing the City to approve billboard permits. (*Id.*) Thus, at least a portion of the money paid to AGS actually was paid to Mayor Richards. (*Id.*)

At an August 21, 2001 hearing, Mayor Richards introduced an amendment to the City ordinances to allow billboards in the public rights of way and on other terms, even in violation of applicable environmental laws, provided that the City Council approved of the particular billboard. (*Id.*, ¶ 31.) This amendment was introduced and adopted by the City, in furtherance of the joint venture, on September 18, 2001. (*Id.*)

On November 6, 2001, the City approved three agreements between it and Regency. ("the Regency Agreements")(*Id.*, 33.) The first provided that the City would lease Regency certain potential billboard sites located in areas zoned for commercial and industrial use. (*Id.*) The second provided that the City would use its best efforts to re-zone six potential sites that were not currently zoned for billboards. (*Id.*) The third provided that the City would use its best efforts to acquire three sites located within the City but owned by Caltrans and rezone them as necessary and then lease them to Regency. (*Id.*) In exchange, Re-

gency was obligated to pay the City $4.8 million over the life of the Regency Agreements. (*Id.*) Although the ostensible purpose of the Regency Agreements was for Regency to build and operate 12 billboards along the 105 freeway in the City on City-owned sites, Regency could not possibly do so because it did not have the necessary Caltrans permits. (*Id.* ¶ 34) The real purpose of the Regency Agreements was to harm Bulletin. (*Id.* ¶ 34.) Also on November 6, elections were held in which two City Council members lost their seats. (*Id.*) On November 13, 2001, the City's Planning Commission passed measures to "spot zone" certain areas to facilitate the November 6 Regency Agreements. (*Id.* ¶ 36.) These zoning changes were illegal. (*Id.*) The City executed the final Regency Agreements on November 28, 2001. (*Id.*)

On November 19, 2001, the City amended the two lease agreements with Regency. (*Id.*, ¶ 37.) Also on November 19, Bulletin received a facsimile from Vista Media, with whom it had entered a joint venture agreement in 1996, terminating the joint venture. (*Id.*) The Defendants induced Vista Media to terminate the joint venture. (*Id.*)

On November 24, 2001, a new City Council was sworn in and installed. (*Id.*, ¶ 40.) The newly-elected City Council terminated the Regency Agreements on December 13, 2001, on the grounds that the Regency Agreements had been improperly approved based on illegal and improper conduct by Mayor Richards. (*Id.*, ¶ 41.) On November 14, 2002, Regency filed an action in Los Angeles Superior Court against the City for breach of the Regency Agreements. (*Id.*, ¶ 42.) Regency and the City agreed to toll the statute of limitations, and Regency dismissed the case without prejudice, ostensibly so the parties could work towards settlement. (*Id.*) However, no settlement has been reached, and Regency and other Defendants continue to assert that they have the right to install billboards next to the 105 freeway regardless of the fact that Regency lacks the necessary Caltrans permits. (*Id.*)

On October 7, 2004, Mayor Richards, Ms. Harris, Bevan Atlee Thomas, and David N. Smith were indicted by a federal grand jury for alleged corruption and fraud in connection with the City. (*Id.*, ¶ 43.) One of the charges related to Mr. Spiker's, KSA's, Mayor Richards', Mr. Smith's, and AGS' negotiation of the Regency Agreements and denial of Bulletin's right to build under its Caltrans permits. (*Id.*) Mr. Smith was indicted for making corrupt payments of $39,000 to certain campaign entities for Mayor Richards between September 19, 2001 and November 1, 2001, for the purpose of influencing and rewarding Mayor Richards in connection with the City's transactions with Defendants. (*Id.*, ¶ 44.) Mr. Smith was also indicted for giving false testimony to the grand jury regarding the purpose of the payments. (*Id.*) On November 1, 2005, a jury convicted Mayor Richards of 35 counts of fraud, extortion, and money laundering. (*Id.*, ¶ 52.) Ms. Harris was also convicted. (*Id.*) Mr. Smith plead guilty on August 9, 2006, to one count of 18 U.S.C. § 666(a), theft or bribery concerning programs receiving federal funds. (Regency's Request for Judicial Notice, Exh. 3).

On February 15, 2005, the City approved a proposed agreement Bulletin had submitted to the City, which authorized Bulletin to build billboards along the 105 freeway in accordance with its Caltrans permits. (*Id.*, ¶ 48.) On August 12, 2005, Regency sued the City and Bulletin seeking a Writ of Mandamus to invalidate the City's agreement with Bulletin. (*Id.*) Regency sought the Writ on the grounds that the City's approval of the agreement was improper and that the City failed to evaluate the potential environmental impact of

the agreement under the California Environmental Quality Act (CEQUA). (*Id.*) In a previous lawsuit Regency filed against the City in November 2002, however, Regency had argued that it had the right to erect billboards at many of the same locations on which it now challenged Bulletin's right to build. (*Id.*)

On September 19, 2005, Mr. Kudler of Bulletin attended a Caltrans oral public auction of various properties. (*Id.,* ¶ 50.) Mr. Kudler intended to buy property at the auction on which Bulletin could build billboards, including a 2,628 square-foot lot on the southeast corner of Imperial Highway and Mona Boulevard in the City ("the Imperial Lot"). (*Id.*) The minimum bid for the Imperial Lot was $29,500. (*Id.*) The lot was too small to build on, because the minimum lot size for building within the City is 5,000 square feet. (*Id.*) Mr. Kennedy of Regency also attended the action, and told Mr. Kudler on behalf of Defendants and as Defendants' agent that he intended to purchase the Imperial Lot on behalf of Defendants and was prepared to take a "losing deal" and to bid up to $150,000 for it. (*Id.*) Bulletin believes that the reason Defendants were willing to take a losing deal and bid up the price on the lot was so that Bulletin would never be able to install its billboards next to the 105 freeway in accordance with its Caltrans permits. (*Id.*) Mr. Kennedy also stated, however, that he would refrain from unreasonably driving up the cost of the Imperial Lot if Mr. Kudler would enter into a joint venture agreement with West Hollywood Properties, LLC ("West"), a business entity that holds the title to properties on which Regency builds and operates some billboards. (*Id.,* ¶ 51.) Fearing that Bulletin would not be able to acquire the Imperial Lot unless he agreed to Mr. Kennedy's proposal, Mr. Kudler entered into the joint venture on behalf of Kudco Diversified, LLC ("Kudco"), the business entity that holds title to the properties on which

Bulletin builds and operates billboards. (*Id.*) The agreement provided that Kudco and West would jointly own the Imperial Lot and lease it to both Regency and Bulletin, and that neither party would develop the property without the other's acknowledgment and approval. (*Id.*)

Bulletin now asserts claims against Regency and other Defendants for (1) violation of the federal Racketeer–Influenced and Corrupt Organizations ("RICO") statute, 18 U.S.C. §§ 1961–68; (2) violation of the Clayton Act, 15 U.S.C. § 15; (3) violation of the Cartwright Act, Cal. Bus. & Prof.Code § 16720; (4) intentional interference with prospective economic advantage; (5) negligent interference with prospective economic advantage; and (6) violation of California's Unfair Competition Law, Business & Professions Code Section 17200 et seq.. (Complaint, ¶¶ 53–85.) Regency moves to strike the Complaint in its entirety pursuant to California's anti-SLAPP statute, Civil Procedure Code Section 425.16. Bulletin argues that the acts alleged in its Complaint are not protected by Section 425.16, and that it has in any event made a showing of probable success on the merits sufficient to avoid the claims' invalidation under the statute. Alternatively, Bulletin requests an opportunity for further discovery to respond to Regency's motion. For the reasons explained below, Regency's motion is granted in part and denied in part.

## II. Regency's anti-SLAPP Motion

### A. The anti-SLAPP Statute

The California Legislature enacted the anti-SLAPP statute, California Code of Civil Procedure Section 425.16, in 1992 to curtail the "disturbing increase in lawsuits brought primarily to chill the valid exercise of the constitutional rights of freedom of speech and petition for the

redress of grievances." CAL. CIV. PROC. CODE § 425.16(a). Section 425.16 provides a procedural remedy to any person, including a corporation, sued in a strategic lawsuit against public participation ("SLAPP"). *See Mattel, Inc. v. Luce, Forward, Hamilton & Scripps,* 99 Cal.App.4th 1179, 1188, 121 Cal.Rptr.2d 794 (2002)(*citing Lafayette Morehouse, Inc. v. Chronicle Publishing Co.,* 37 Cal.App.4th 855, 862–63, 44 Cal.Rptr.2d 46 (1995))("The term 'person' [as used in Section 425.16] includes a corporation.") Under Section 425.16, the sued person may bring a special motion to strike a claim "arising from any act of that person in furtherance of the person's right of petition or free speech under the United States or California Constitution in connection with a public issue." CAL. CIV. PROC. CODE § 425.16 (Deering 2005). A challenged "act" qualifies for protection under the statute if it falls into one of four categories: "(1) any written or oral statement or writing made before a legislative, executive, or judicial proceeding, or any other official proceeding authorized by law; (2) any written or oral statement or writing made in connection with an issue under consideration or review by a legislative, executive, or judicial body, or any other official proceeding authorized by law; (3) any written or oral statement or writing made in a place open to the public or a public forum in connection with an issue of public interest; (4) or any other conduct in furtherance of the exercise of the constitutional right of petition, or the constitutional right of free speech in connection with a public issue or an issue of public interest." CAL. CIV. PROC. CODE § 425.16(e). An anti-SLAPP motion may be based on "any defect in the plaintiff's action," including failure to state a claim or failure to adduce evidence to support the claim. *Rogers v. Home Shopping Network,* 57 F.Supp.2d 973, 976 (C.D.Cal. 1999).

In considering an anti-SLAPP motion, the court must engage in a two-step process. First, it must determine whether the moving party has made an initial prima facie showing that the plaintiff's claims "arise from acts of the [moving party] taken to further the [moving party's] right of free speech or petition in connection with a public issue." *Ingels v. Westwood One Broad. Servs., Inc.,* 129 Cal.App.4th 1050, 1061, 28 Cal.Rptr.3d 933 (2005). To make this determination, the court must consider "the pleadings, and supporting and opposing affidavits stating the facts [on] which the liability or defense is based." *Martinez v. Metabolife Int'l, Inc.,* 113 Cal.App.4th 181, 186, 6 Cal.Rptr.3d 494 (2003) (citation omitted). If the moving party fails to carry its initial burden, the anti-SLAPP motion must be denied. *Id.* If the moving party makes the prima facie showing, however, the burden shifts to the plaintiff to demonstrate a "probability that the [opposing party] will prevail on the claim." CAL. CIV. PROC. CODE § 425.16(b)(1). *See also Ingels,* 129 Cal. App.4th at 1061, 28 Cal.Rptr.3d 933. To satisfy this burden, the plaintiff must show that "the complaint is legally sufficient and supported by a prima facie showing of facts to sustain a favorable judgment if the evidence submitted by the plaintiff is credited." *Metabolife, International, Inc. v. Wornick,* 264 F.3d 832, 840 (9th Cir.2001)(*citing Wilcox v. Superior Court,* 27 Cal.App.4th 809, 33 Cal.Rptr.2d 446, 455 (1994)). In other words, the burden is "much like that used in determining a motion for nonsuit or directed verdict, which mandates that 'no reasonable jury' could find for the plaintiff." *Id.* (*citing Wilcox,* 33 Cal.Rptr.2d at 454). If the plaintiff fails to make the requisite showing, the motion to strike must be granted. *Ingels,* 129 Cal.App.4th at 1061–62, 28 Cal. Rptr.3d 933.

■ Special procedural rules apply where an anti-SLAPP motion is brought in federal court. If a defendant makes an anti-SLAPP motion based on the plaintiff's failure to submit evidence to substantiate its claims, the motion is treated as a motion for summary judgment, and discovery "must be 'developed sufficiently to permit summary judgment under Rule 56.'" *In re Bah*, 321 B.R. 41, 45 n. 6 (9th Cir. BAP2005) (*citing Rogers v. Home Shopping Network*, 57 F.Supp.2d 973, 982 (C.D.Cal.1999)). This is because to permit a defendant to invoke Section 425.16 to require a plaintiff to present evidence to support her claims before an opportunity for discovery would directly conflict with Federal Rule of Civil Procedure 56. *Rogers*, 57 F.Supp.2d at 980–82 ("[w]hen a state procedural rule directly conflicts with a Federal Rule of Civil Procedure, the Federal Rule generally controls ... [I]f a defendant desires to make a special motion to strike [under Section 425.16] based on the plaintiff's lack of evidence, the defendant may not do so until discovery has been developed sufficiently to permit summary judgment under Rule 56.") If an anti-SLAPP motion is based on legal deficiencies in the complaint, a federal court "must determine the motion in a manner that complies with the standards set by Federal Rules 8 and 12." *Id.* (*citing Rogers*, 57 F.Supp.2d at 982.)

## B. Application to Bulletin's Claims

Anti–SLAPP Motions challenge particular causes of action, rather than individual allegations or theories supporting a cause of action. Cal. Civ. Proc. Code § 425.16(b)(1)("A cause of action ... shall be subject to a special motion to strike..."); Robert I. Weil & Ira A. Brown, Jr., California Practice Guide: Civil Procedure Before Trial 7–C, § 7:239 (2005). Where a complaint contains both SLAPP and non-SLAPP causes of action, the SLAPP claims alone may be stricken. *Shekhter v. Financial Indem. Co.*, 89 Cal.App.4th 141, 150, 106 Cal. Rptr.2d 843 (2001). Thus, the Court will examine each of Bulletin's causes of action, and the allegations supporting those causes of action, to determine if they should be stricken under Section 425.16.

## 1. RICO and Clayton Act Claims

■ Bulletin argues that the anti-SLAPP statute does not apply to federal claims such as Regency's claims under RICO and the Clayton Act. Bulletin is correct. Although the anti-SLAPP statute does apply to state law claims brought in federal court, *United States ex rel Newsham v. Lockheed Missiles & Space Co.*, 190 F.3d 963, 973 (1999), it does not apply to federal question claims in federal court because such application would frustrate substantive federal rights. *Globetrotter Software, Inc. v. Elan Computer Group, Inc.* 63 F.Supp.2d 1127, 1130 (N.D.Cal. 1999); *In re Bah*, 321 B.R. 41, 46 (9th Cir.BAP2005) ("We ... agree with the *Globetrotter* court that the anti-SLAPP statute may not be applied to matters involving federal questions..."). *See also New.Net, Inc. v. Lavasoft*, 356 F.Supp.2d 1090, 1099–100 (C.D.Cal.2004) ("Defendant properly directs its anti-SLAPP motion only to the pendant state law claims set out in the Complaint.") Although Regency attempts to distinguish *Globetrotter* on the ground that it "involved a patent case for which the Federal Court held exclusive jurisdiction," and argues that Section 425.16 should apply to federal claims that could also be brought in state court, nothing in *Globetrotter* suggests that its holding is limited to claims as to which there is exclusive federal jurisdiction. In holding that the anti-SLAPP statute does not apply to federal question claims in federal court, the *Globetrotter* court determined that such application "is not supported by the *Erie* rationale articulated in the *Lock-*

*heed* decision." *Globetrotter,* 63 F.Supp.2d at 1130. *Lockheed,* in turn, reasoned that the party seeking to avoid application of the anti-SLAPP statute "ha[d] not identified any federal interests that would be undermined by" application of the anti-SLAPP statute to state law claims brought in federal court, and that "California has articulated the important, substantive state interests furthered by the anti-SLAPP statute." *Lockheed,* 190 F.3d at 973. In other words, the *"Erie* rationale articulated in the *Lockheed* decision," on which the *Globetrotter* court based its holding, appears to have been a balancing of state and federal interests. *See Bah,* 321 B.R. at 46 ("[The Ninth Circuit] did indicate in *Lockheed* ... that the [anti-SLAPP] statute may not be applicable where federal interests would be 'undermined.'") Thus, *Globetrotter's* holding appears to be based on a finding that to apply the anti-SLAPP statute to federal claims in federal court would undermine the federal interest in determining procedural rules that apply to federal claims in federal court, and/or the substance of federal law. That holding does not appear to be limited to claims exclusively within federal jurisdiction.

■ Regency argues that failure to apply the anti-SLAPP statute to federal causes of action that could also be brought in state court would contravene *Erie's* holding that, in a diversity suit, state substantive law must be applied to prevent "forum shopping." This argument falls short for two reasons. First, *Erie* has no application to federal question claims, only to state law claims in diversity actions and pendent state law claims in federal question cases.[1] Second, while Regency may be correct that federal courts' refusal to apply the anti-SLAPP statute to federal

question claims in federal court could result in forum-shopping, at least to the extent state courts would apply the anti-SLAPP statute to federal claims, that argument ignores the competing federal interest in uniform application of federal law. *See Byrd v. Blue Ridge Rural Elec. Co-op., Inc.,* 356 U.S. 525, 78 S.Ct. 893, 2 L.Ed.2d 953 (1958)(declining to apply state rule requiring bench trial of a particular issue in workers' compensation cases, even though the federal rule could produce a different outcome, because of the federal interest in distributing trial functions between judge and jury in federal court). To permit a defendant sued on a federal claim in federal court in California to bring an anti-SLAPP motion to strike the federal claim simply because a California statute permits such a motion, when a defendant sued on the same federal claim in federal court in another state could not do so, would make the available defenses to the federal claim dependent on the location of the federal court and the substance of the forum state's laws. This would frustrate federal courts' interest in prescribing rules of procedure applicable to federal claims, and in uniformity of federal law. *See Newsham,* 190 F.3d at 973 (application of anti-SLAPP statute to claims in federal court depends on whether any federal interest would be frustrated.) Moreover, as the anti-SLAPP statute has been described as establishing a rule of "substance," rather than procedure, *New.Net,* 356 F.Supp.2d at 1099, applying it to federal claims arguably would permit state law to affect and alter the substance of federal claims in violation of the Supremacy Clause of the Constitution. *See Martinez v. State of California,* 444 U.S. 277, 284 n. 8, 100 S.Ct. 553, 62 L.Ed.2d 481 (1980)(*quoting McLaughlin v. Tilendis,*

---

1. Diversity jurisdiction does not exist in this case, because Bulletin and several Defendants are citizens of the same state, California.

398 F.2d 287, 290 (7th Cir.1968))(stating, in an action brought under 42 U.S.C. § 1983, that state law cannot immunize conduct that is wrongful under the federal statute, because "[a] construction of the federal statute which permitted a state immunity defense to have a controlling effect would transmute a basic guarantee into an illusory promise, and the supremacy clause of the Constitution insures that the proper construction may be enforced.") While the anti-SLAPP statute furthers "important, substantive state interests," *Id.*, California has no interest in dictating rules of procedure or substance applicable to federal claims brought in federal court. Consequently, the Court finds that the anti-SLAPP statute is inapplicable to Bulletin's RICO and Clayton Act claims.

### 2. State Law Claims

Bulletin also asserts state common law and statutory claims. These claims are based on three categories of alleged conduct by Regency: (1) statements made by Mr. Kennedy on Regency's behalf to Mr. Kudler at the Caltrans auction; (2) Regency's bribery of Mayor Richards to induce him to induce Lynwood to award contracts to Regency and refuse to grant permits to Bulletin, and alleged extortion of Bulletin through its purported agent, Mr. Spiker; and (3) Regency's filing of the CEQUA suit against the City and Bulletin in 2005. The Court will engage in the Section 425.16's two-step process for each of these allegations.

### a. Statements made by Mr. Kennedy at the Caltrans Auction

█ Regency argues that Mr. Kennedy's statements to Mr. Kudler at the Caltrans auction are protected by the anti-SLAPP statute because they fall within subsections (2) through (4) of Section 425.16(e). Those subsections protect, respectively:

(2) any written or oral statement or writing made *in connection with an issue under consideration or review by a legislative, executive, or judicial body,* or *any other official proceeding* authorized by law;

(3) any written or oral statement or writing made *in a place open to the public* or a public forum *in connection with an issue of public interest;* [and]

(4) or any other conduct in furtherance of the exercise of the constitutional right of petition, or the constitutional right of free speech *in connection with a public issue or an issue of public interest.*

CAL. CIV. PROC. CODE § 425.16(e)(emphasis added). Regency argues that its participation in the auction "was in furtherance of its exercise of its constitutional rights of petition and speech ... in connection with the sale of lands for the purpose of billboard advertising, a public issue and an issue of public interest." (Memorandum of Points and Authorities, p. 11.) Bulletin counters that subsections (2) through (4) do not protect the auction statements because the statements are not directly related to any "official proceeding" and are not "issues of public interest" but merely statements made in connection with a business transaction. In support of its argument, Bulletin cites the case *Blackburn v. Brady,* 116 Cal.App.4th 670, 10 Cal. Rptr.3d 696 (2004).

*Blackburn* involved claims for partition, accounting, and fraud brought by a plaintiff creditor who attended a sheriff's sale to purchase half of an estate owned by a partner of the defendant. *Blackburn,* 116 Cal.App.4th at 672–73, 10 Cal.Rptr.3d 696. The plaintiff had obtained a money judgment against the partner and an order charging partner's interest against the defendant, and the sheriff's sale had taken place when the partner failed to pay anything under the order charging partner's

interest. *Id.* The plaintiff alleged that the defendant had attended the sheriff's sale and bid on the property solely to drive up the price, and that the bids were fraudulent and made with the intent to induce the plaintiff to pay more money than the property was worth. *Id.* at 673–74, 10 Cal. Rptr.3d 696. The defendant brought an anti-SLAPP motion, arguing that the bids at the action were protected under Section 425.6(e)(1) as statements made in "an official proceeding authorized by law." The court denied the anti-SLAPP motion, holding that allegations of fraud committed in bidding at a sheriff's auction concern "a purely business type event or transaction and ... not the type of protected activity contemplated under Section 425.16, subdivision (e)." *Id.* at 677, 10 Cal.Rptr.3d 696. Subsection (e)(2) was inapplicable, the court held, because the sheriff's sale did "not concern an issue under review or determine some disputed matter as contemplated under the anti-SLAPP law [but] consist[ed] merely of offers and the acceptance of the highest bid made according to certain requirements without any determination based on the exercise of one's free speech or petition rights." *Id.* The connection with a judicial proceeding was too "remote." *Id.* Thus, the court stated, "it concerns a business transaction somewhat analogous to the unprotected activity of bidding on public contracts ... and not the exercise of protected activity under section 425.16." *Id.*

For the reasons stated in *Blackburn,* Mr. Kennedy's alleged statements at the Caltrans auction are not protected under Section 425.16. Like the defendant's bids in that case, the auction statements concerned business dealings rather than an issue of public interest or an issue "under review" by a public body. Like the sheriff's sale, the Caltrans auction was merely a series of offers and acceptances according to preset requirements, rather than an official proceeding to "review" broad issues

concerning land sales. Moreover, the only statements Mr. Kennedy is alleged to have made at the auction concern business dealings between Regency and Bulletin: that he intended to purchase the Imperial Lot on behalf of Regency, that he was prepared to take a "losing deal" and bid up to $150,000 for it, but that he would refrain from unreasonably driving up the cost of the lot if Mr. Kudler would enter into a joint venture agreement with West Hollywood Properties, LLC. Indeed, the Caltrans auction is even more tangentially related to an "official proceeding" than the sheriff's sale in *Blackburn,* because the sheriff's sale, unlike the auction in this case, was court-ordered. Because the auction presents an even weaker case for anti-SLAPP protection than *Blackburn,* the court concludes that Regency has failed to meet its initial burden to show that the auction statements are protected by the anti-SLAPP statute.

### b. Payments to Mayor Richards and Statements to Mr. Kudler

■ Regency further argues that the anti-SLAPP statute applies to Bulletin's allegations that Regency made illegal payments to Mayor Richards, AGS, and KSA, and to allegations that KSA and AGS agents attempted to "extort" money from Bulletin in March 2000 and November 2001 by threatening it with financial harm if it did not join the conspiracy. Regency alleges that its payments to Mayor Richards were merely "campaign contributions," and that the statements to Mr. Kudler were not made by Regency and are protected by Section 425.16 in any event. Bulletin counters that the payments and statements amounted to bribery and extortion, which are not protected under the anti-SLAPP statute, and that the statements made to Mr. Kudler were made by AGS and KSA as agents of Regency. As support for these allegations, Plaintiff

points to a plea agreement signed by a KSA employee, David N. Smith, in which he admits that he made payments to Mayor Richards' campaign on Regency's behalf, apparently in exchange for Mayor Richards causing Regency to obtain billboard contracts from the City. (Regency's Request for Judicial Notice, Exh. 3.)

Campaign contributions are protected political speech. *Paul for Council v. Ricki Hanyecz*, 85 Cal.App.4th 1356, 1366–67, 102 Cal.Rptr.2d 864 (2001) (*overruled on other grounds in Equilon Enterprises v. Consumer Cause, Inc.*, 29 Cal.4th 53, 124 Cal.Rptr.2d 507, 52 P.3d 685 (2002)). However, campaign contributions made "with a corrupt intent to influence . . . the person to whom it is given, in his action, vote, or opinion, in any public or official capacity" are not protected because they are not a "valid" exercise of one's constitutional rights of free speech or petition. *Id.;* CAL. PENAL CODE § 7(6) (defining "bribe" as "anything of value or exchange, present or prospective, or any promise or undertaking to give any, asked, given, or accepted, with a corrupt intent to influence, unlawfully, the person to whom it is given, in his or her action, vote, or opinion, in any public or official capacity.") Thus, whether Regency's alleged payments to Mayor Richards are protected under the anti-SLAPP statute depends on whether or not they were made with a corrupt intent to influence Mayor Richards' actions or votes in his capacity as mayor.

█ Where the parties to an anti-SLAPP motion dispute the legality of the defendant's actions, and the plaintiff cannot establish as a matter of law that the actions were illegal, "then the claimed illegitimacy of the defendant's acts is an issue which the plaintiff must raise and support in the context of the [step two] discharge of the plaintiff's burden to provide a prima facie showing of the merits of the plaintiff's case." *Paul for Council*, 85 Cal. App.4th at 1367, 102 Cal.Rptr.2d 864.

'We believe this burden should be met in the same manner as the plaintiff meets the burden of demonstrating the merits of its causes of action: by showing the defendant's purported constitutional defenses are not applicable to the case as a matter of law or by a prima facie showing of facts which, if accepted by the trier of fact, would negate such defenses.'

*Paul for Council*, 85 Cal.App.4th at 1367, 102 Cal.Rptr.2d 864 (*quoting Wilcox v. Superior Court*, 27 Cal.App.4th 809, 824, 33 Cal.Rptr.2d 446 (1994)). Because the parties dispute whether Regency's "campaign contributions" to Mayor Richards were intended to induce him to take action favorable to Regency, Bulletin has the burden of submitting evidence sufficient to permit a reasonable jury to find in its favor on that issue.

Bulletin, with some unwitting help from Regency, has made the necessary prima facie showing to negate Regency's constitutional defense that the payments were legal campaign contributions. Mr. Smith's plea agreement, submitted by Regency, is admissible under Federal Rule of Evidence 803(22) and not barred by the hearsay rule. *See Scholes v. Lehmann*, 56 F.3d 750, 762 (7th Cir.1995)(guilty plea admissible under Federal Rule of Evidence 803(22)). *See also Hancock v. Dodson*, 958 F.2d 1367, 1372 (6th Cir. 1992)(plea agreement was admissible under the residual exception to the hearsay rule where the defendant was represented by counsel and had sufficient opportunity to challenge the guilty plea after it was entered); *In re Slatkin*, 310 B.R. 740, 745 (C.D.Cal.2004)(same). The plea agreement states the following:

- KSA represented Regency between 1999 and 2002 "in seeking approval of

outdoor advertising displays with the City of Lynwood" (RJN Exh. 3, ¶ 1.)

● KSA sent a letter to Mayor Richards and another City Council member on April 10, 2000, stating that KSA represented Regency, which was interested in placing billboards in Lynwood along the 105 freeway, and that Lynwood could earn a "$4 million windfall." (*Id.*, ¶ 3.)

● Between May 2000 and January 2001, Mr. Smith and KSA "had direct negotiations with" Mayor Richards concerning Regency's billboard proposal of Lynwood, during which Mayor Richards expressed support for the project. In June 2000, Mayor Richards told Mr. Smith that the City would hire a consultant who would be an expert in outdoor advertising to work with Regency. (*Id.*, ¶ 4.)

● On or about February 1, 2001, KSA submitted a detailed, formal proposal directly to Richards on Regency's behalf, to erect up to eighteen billboards in the City adjacent to the 105 freeway. The proposal offered the City a $400,000 fee per structure for six of the structures, with the terms left open for the additional proposed structures. Following the letter, KSA and Mayor Richards continued their discussions regarding the Regency billboard proposal. (*Id.*, ¶ 5.)

● On or about April 22, 2004, in a personal and confidential letter to Richards, Mr. Smith provided Richards with pictures of a proposed on-site advertising display that would conflict with at least one of the billboards proposed by KSA. He told Mayor Richards that he "got these photos sort of underhandedly. Please don't get me in trouble. It was suggested to me that the City might want to do some fairly extensive background on the company proposing the sign." Mr.

Smith gave this information to Mayor Richards intending to persuade Mayor Richards to use his authority as Mayor of Lynwood to block the on-site sign [that would conflict with KSA's billboard proposal] from being erected in the City. Thereafter, in response to Mr. Smith's letter, Mayor Richards delayed the on-site advertising structure from becoming a part of a redevelopment project approval. (*Id.*, ¶ 7.)

● Mr. Smith believed that Mayor Richards would provide his full support to KSA's proposed billboard project is Mr. Spiker, Mr. Smith, and Regency lived up to their commitments to Richards. (*Id.*, ¶ 8.)

● In or about June 2001, Mayor Richards told Mr. Smith that he planned to run for re-election and needed financial support. On or about June 15, 2001, Mr. Smith advised Drake Kennedy of Regency that Mayor Richards needed "financial support" for his campaign. (*Id.*, ¶ 9.)

● On or about August 1, 2001, after KSA submitted a revised billboard proposal to AGS, Lynwood's exclusive representative in connection with outdoor advertising, Mr. Smith, told Mr. Spiker that Regency and KSA must "step up to the plate" to provide financial support to Richards' political campaign. (*Id.*, ¶ 11.)

● On or about August 7, 2001, KSA sent a memo drafted by Smith to Drake Kennedy of Regency, in which KSA advised that it was devoting a considerable amount of company time and money to Mayor Richards' re-election campaign and sought a financial commitment from Regency and assistance in getting billboard advertisements for Richards' campaign. (*Id.*, ¶ 12.)

● On or about August 14, 2001, Mr. Smith, Mr. Spiker, Mayor Richards,

and a political consultant met to discuss Mayor Richards' reelection campaign strategy. Mr. Spiker and Mr. Smith each agreed to provide $12,500 to Mayor Richards, with Regency to provide the other $25,000 through so-called "consulting fees" previously billed to Regency by KSA. (*Id.*, ¶ 14.)

- On or about August 14, 2001, Mayor Richards said that the City would agree to an exclusive negotiating agreement with KSA and Regency, and that he wanted to complete a billboard transaction with Regency before the November 2001 elections. (*Id.*, ¶ 16.)

- Mr. Smith made a payment of $7,500 to Mr. Richards in October 2001, corruptly intend[ing] to reward Mayor Richards for his support of the Regency billboard proposal, including Mayor Richards' vote in favor of the revised zoning ordinance and his support for an exclusive negotiating agreement for Regency. Had Mayor Richards not previously supported Regency's billboard deal, Mayor Smith would not have written the check to Richards for Senate as Richards directed. (*Id.*, ¶¶ 20–22.)

- On or about November 6, 2001, the Lynwood City Council voted to approve two agreements with Regency for nine outdoor advertising displays for up to $400,000 per sign to the City. Those agreements (as amended) were approved by the City Council on November 19, 2001. Both motions passed 3–2, with Mayor Richards casting the deciding vote. (*Id.*, ¶ 24.)

Regency also submits a deposition by a man named John Keith Stevens, a former Regency employee, who states among other things that Drake Kennedy of Regency "struck a deal ... to pay the city" a million dollars and arranged to pay $2 million to Mayor Richards' sister so that the City would allow Regency to build billboards in an area in which no billboards were permitted under state law, and to prevent Bulletin from obtaining a City contract. (Stephens Depo., 721:9—724:4.)

Bulletin submits further evidence indicating that Regency made corrupt payments to Mayor Richards in exchange for city contracts. It submits a declaration by Mr. Stevens stating that "in about August of 2001 Smith, Spiker, KSA, Drake [Kennedy] and Regency had agreed to fund the re-election of Mayor Paul Richards ... in the amount of $50,000 in exchange for getting their billboard project approved. However, the Regency/KSA scheme involved hiding the political expenditure through a false 'consulting fee' of KSA. Although Spiker and Smith had to contribute half, which was Regency's philosophy to get consultants to contribute themselves to a project, Spiker and Smith would be able to recover their expenses from their commission which therefore made all of the $50,000 Regency's money." (Stevens Decl., ¶¶ 6–7.)

The foregoing evidence is more than sufficient to permit a reasonable jury to find that Regency knowingly paid money to Mayor Richards, either directly or through KSA and AGS, intending to induce Mayor Richards to use his office to secure City contracts for Regency and prevent Bulletin from obtaining permits. Mr. Smith states that Regency submitted a proposal, through KSA, to Mayor Richards to build billboards along the 105 freeway, that KSA told Regency that Mayor Richards needed campaign support, that KSA agreed that Regency would make cash payments to Mr. Richards, and that Mr. Smith made a payment to Mayor Richards to secure benefits for Regency. Mr. Stephens' statements indicate that Regency knew the payments KSA was making to Mayor Richards on its behalf were for the

purpose of inducing Mayor Richards to reward Regency with City contracts and to cause the City to refuse to give permits to Bulletin. These statements also are sufficient to support a finding that the alleged March 2000 and November 2001 communications by AGS and KSA to Mr. Kudler were made in furtherance of an effort to bribe Mayor Richards and intimidate Bulletin into joining the conspiracy. Bulletin consequently has made a prima facie showing that Regency's alleged payments to Mayor Richards, and the March 2000 and November 2001 conversations between Mr. Kudler and agents of AGS and KSA, are not protected under the anti-SLAPP statute.[2] Regency's motion must therefore be denied insofar as it relates to allegations concerning those payments and conversations.

### c. 2005 CEQUA Lawsuit

▮ The final allegation Regency contends is protected under the anti-SLAPP statute is Bulletin's allegation that Regency filed a CEQUA lawsuit against it in 2005 for the purpose of invalidating Bulletin's 2005 agreement with the City. As Regency argues, filing a lawsuit is a protected activity under Section 425.16. *Mattel, Inc. v. Luce, Forward, Hamilton & Scripps*, 99 Cal.App.4th 1179, 1188, 121 Cal.Rptr.2d 794 (2002)("It follows that 'a cause of action arising from a defendant's alleged improper filing of a lawsuit may appropriately be the subject of a section 425.16 motion to strike.") Moreover, Bulletin cannot show that any state law causes of action based on the filing of the CEQUA suit are likely to succeed, because any such causes of action would be barred by California's litigation privilege, Civil Code Section 47.

However, the fact that the CEQUA allegations are subject to dismissal under Section 425.16 does not automatically mean Bulletin's claims must be dismissed. Where a cause of action alleges both acts protected by the anti-SLAPP statute and acts not protected under the statute, the entire cause of action may only be stricken under Section 425.16 if the protected acts are not merely "incidental" to the unprotected conduct. *Fox Searchlight Pictures, Inc. v. Paladino*, 89 Cal.App.4th 294, 308, 106 Cal.Rptr.2d 906 (2001); *Mann v. Quality Old Time Service, Inc.*, 120 Cal.App.4th 90, 103, 15 Cal.Rptr.3d 215 (2004).[3] Whether the anti-SLAPP statute strikes the claim is determined by the claim's "principal thrust" or "gravamen," and "when the allegations referring to arguably protected activity are only incidental to a cause of action based essentially on unprotected activity, collateral allusions to protected activity should not subject the cause of action to the anti-SLAPP statute." *Martinez v. Metabolife Int'l, Inc.*, 113 Cal. App.4th 181, 188, 6 Cal.Rptr.3d 494 (2003) (anti-SLAPP statute did not apply to breach of express warranty and fraud claims that contained allegations relating to arguably protected commercial speech, where "the core conduct underlying the breach of warranty and fraud claims seeks recovery for physical injuries caused by activities outside the boundaries of conduct to which the anti-SLAPP statute applies [i.e. manufacturing and selling a defective product].")

---

**2.** While Regency is correct that the November 2001 phone call to Regency by KSA is not alleged to have been made by Regency itself, that argument is irrelevant to whether the conduct is protected by the anti-SLAPP statute.

**3.** The issue whether a cause of action alleging both protected and unprotected acts is subject to being stricken under the anti-SLAPP statute is currently before the California Supreme Court in *Kids Against Pollution v. California Dental Ass'n*, Case No. S117156.

Here, the "principal thrust" of Bulletin's claims is an alleged corrupt conspiracy between Regency, KSA, AGS, their principals, and Mayor Richards to reward Regency and deny permits to Bulletin between 1998 and 2001. The 2005 CEQUA lawsuit is a single event, apparently unconnected to that conspiracy, filed long after the alleged conspiracy had ceased and Mayor Richards had been removed from office. Because Bulletin's state law causes of action incorporate all of the Complaint's factual allegations, the vast majority of which relate to the conspiracy, Regency's filing of the CEQUA suit appears to be a relatively minor part of the larger pattern of alleged conduct. Therefore, the Court concludes that Bulletin's state law claims are not subject to dismissal because the only protected conduct, the CEQUA lawsuit, is merely incidental to the main, unprotected conduct of making payments to Mayor Richards to influence the awarding of billboard contracts.

## III. Conclusion

For the foregoing reasons, Regency's motion to dismiss Bulletin's complaint pursuant to California Code of Civil Procedure Section 425.16 is DENIED.