Filed 4/7/15  FTR International v. Bd. of Trustees of the Los Angeles Community College Dist. CA2/2

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION TWO

| | |
|---|---|
| FTR INTERNATIONAL, INC., et al.,<br><br>Plaintiffs and Respondents,<br><br>v.<br><br>BOARD OF TRUSTEES OF THE LOS ANGELES COMMUNITY COLLEGE DISTRICT et al.,<br><br>Defendants and Appellants. | B242220<br>(c/w B244407, B252040)<br><br>(Los Angeles County<br>Super. Ct. No. BS136137) |

APPEAL from orders of the Superior Court of Los Angeles County. Jane L. Johnson, Judge.  Affirmed in part, reversed in part and remanded with directions.

Orbach, Huff & Suarez, David M. Orbach, Enrique M. Vassallo, Marley S. Fox and Fabiola M. Rivera for Defendants and Appellants.

Traber & Voorhees, Theresa M. Traber, Lauren Teukolsky, Rebecca Peterson-Fisher; Raisin and Kavcioglu, Bradley A. Raisin and Armenak Kavcioglu for Plaintiffs and Respondents.

_____

The Board of Trustees (Board) of the Los Angeles Community College District (District) debarred FTR International, Inc. (FTR) and Nizar Katbi (Katbi) (collectively FTR Parties) from bidding or working on District projects for five years. Alleging various wrongs, the FTR Parties sued the Board and six of its individual trustees (Trustees).[1] The Board and Trustees appeal from: (1) the denial of their anti-SLAPP[2] motion to strike the FTR Parties' first amended complaint (FAC); (2) the denial of the Trustees' anti-SLAPP motion to strike the new claims in the third amended complaint (TAC); and (3) the award of attorney fees to the FTR Parties after the trial court found that the first anti-SLAPP motion was frivolous.

Based on qualified immunity, we conclude that the first anti-SLAPP motion should have been granted as to the FTR Parties' personal capacity claim against the Trustees for denial of procedural due process at the debarment hearing in violation of title 42 United States Code section 1983 (section 1983). Because of the immunities in Government Code sections 820.2 and 820.9, the second anti-SLAPP motion should have been granted as to the FTR Parties' claim for intentional interference with contract and/or prospective economic advantage, and their claim for negligence. The award of attorney fees must be reversed because the first anti-SLAPP motion had partial merit and was not frivolous as a matter of law. In all other respects, the orders are affirmed.

Upon remand, what remains for further proceedings are: a taxpayer claim against the Board and Trustees pursuant to Code of Civil Procedure section 526a; official capacity claims against the Trustees under section 1983 for denial of procedural due process and First Amendment retaliation; and a personal capacity claim against the Trustees under section 1983 for First Amendment retaliation.

---

[1] The Trustees are Miguel Santiago, Tina Park (Trustee Park), Nancy Pearlman, Kelly Candaele, Scott J. Svonkin, and Steve Veres.

[2] "SLAPP" is shorthand for strategic lawsuit against public participation. (*Fahlen v. Sutter Central Valley Hospitals* (2014) 58 Cal.4th 655, 665.) The anti-SLAPP statute is Code of Civil Procedure section 425.16.

2

*The Project at Los Angeles Valley College*

In 2006, the District contracted with FTR to build the Allied Health and Science Building at Los Angeles Valley College (Allied Project). Robert Payinda (Payinda) was the District's project inspector. The Allied Project was substantially complete in 2008.

Katbi negotiated with the District's project manager to finalize the job and settle all outstanding issues in exchange for a $40,000 credit from FTR. The District's project manager told FTR it had no more responsibility on the project. As a result, FTR and the District entered into a final change order that stated: "This is a final change order for full and final settlement for all disputes, extras, credits, back charges, time delays, delay for damages and/or impact between both parties." Katbi understood that after signing the final change order, FTR and the District would not have claims against each other. Subsequently, he submitted a Division of the State Architect Verified Report (DSA 6 Form) and represented that the Allied Project was 100 percent complete.[4] On August 3, 2009, the Board ratified the final change order between the parties.

On March 24, 2010, FTR filed a petition for writ of mandate directing the District to release funds withheld pursuant to stop notices.

---

[3] Below, the District and Trustees objected to evidence submitted by the FTR Parties. The Board and Trustees contend that the trial court erred by overruling a majority of those objections. The objections in connection with the first anti-SLAPP motion have been waived on appeal because the Board and Trustees failed to analyze their objections by applying the relevant law to the specific objectionable evidence. (*Alvarez v. Jacmar Pacific Pizza Corp.* (2002) 100 Cal.App.4th 1190, 1206, fn. 11 ["It is not our responsibility to develop an appellant's argument"].) Certain objections pertaining to the second anti-SLAPP motion have been adequately briefed, and we have considered them. Our statements of facts was written with these considerations in mind.

[4] At the debarment hearing, the architect for the Allied Project, Andrew Labov, was asked to explain the difference between substantial completion and 100 percent completion. He testified: "The difference is . . . that substantial completion you identify that . . . work is still remaining to be done on the project, and final completion is when all parties agree that all of that work has been completed or the owner waives his right and accepts work in the as-is condition."

3

As authorized by the Board, the District filed a cross-complaint and alleged that FTR was negligent and breached its contract by performing defective work when constructing the Allied Project. In a statement of claims, the District listed $4,366,111.64 in damages.[5]

*The Project at Los Angeles Mission College*

In 2007, the District hired FTR as the general contractor to build the Health and Physical Education Fitness Center at Los Angeles Mission College (Mission Project). By mid-2008, the District issued change order No. 1, which related to a pipeline and earthwork. In addition, the college project manager, Nick Quintanilla (Quintanilla),[6] asked FTR to comply with field order Nos. 36 and 37, which was grading and trenching work outside the scope of the original project. At first, FTR balked at the field orders because it had not been paid about $1 million for already completed extra work. However, Katbi told his employees to move forward, and they did.

FTR drafted pay request No. 14, which it submitted to the District. In that pay request, for each item, FTR estimated how much work was completed and how much it expected to complete by the end of July 2008. Regarding change order No. 1, FTR estimated that 43 percent was complete.

Quintanilla spoke to his superiors and was advised that the District's executive director, Larry Eisenberg (Eisenberg), and others wanted to avoid any delays and had therefore approved paying FTR for extra work with money earmarked for other items. Subsequently, Quintanilla told FTR to bill 90 percent of the work on change order No. 1.

---

[5]    The record suggests that this action was deemed related to a lawsuit filed by Hickman Mechanical, Inc. against FTR (*Hickman Mechanical, Inc. v. FTR International, Inc. et al.* (Super. Ct. L.A. County, No. BC398074) (*Hickman* Action).

[6]    Through a construction company called Gateway, Quintanilla was the person hired by the District to supervise the Mission Project. Communication between FTR and the District went through Quintanilla. FTR submitted pay applications once a month after negotiating the percentages with Quintanilla.

FTR revised pay request No. 14 as Quintanilla instructed, and it was then paid by the District.[7]

*The Los Angeles Times Articles*

In February 2011, the Los Angeles Times published a series of articles accusing college officials, contractors and the Board of wasting tens of millions of dollars due to poor planning, frivolous spending and shoddy workmanship. A March 2011 article focused on the Allied Project. It claimed that the project had numerous and serious defects and was critical of FTR, Eisenberg and many others. According to the article, Payinda issued 422 citations for deviations in design. Later in the same month, the Los Angeles Times published an article stating that the District had fired Eisenberg, and that he would be replaced by Thomas Hall (Hall) as the interim executive director.

*Katbi's Letter to the Trustees*

In a letter dated October 5, 2011, Katbi wrote to the Trustees to defend FTR against rumors, gossip and false statements made by the Los Angeles Times and former District employees. According to the letter: None of the accusations against FTR were true. The problems at the Allied Project were caused by subcontractors, and FTR had insurance in place to cover the defective work. The real problem at the Allied Project was Payinda. He was a racist who repeatedly disparaged Arabs, who he referred to as "turban heads." In addition, he said companies such as FTR should not be allowed to take jobs away from American companies. At one point, FTR complained to the District that Payinda was using foul language to FTR's employees and displaying lewd pictures of naked women on the walls of the trailer/office that he used on the college campus. After FTR complained, Payinda smeared FTR by blaming it for all the design errors and creating a long list of nonconforming work. Moreover, Payinda submitted fraudulent bills to the District for his time and that of an assistant inspector. Based on Payinda as a

---

[7]     The FTR parties represent that the District "later modified the paperwork to reflect the proper payments and work done under the proper work orders."

source, the Los Angeles Times published several articles containing false statements that painted FTR in a negative light.

Continuing on, the letter stated that when FTR submitted the low bid on a project at East Los Angeles College, the second and third low bidders sent protest letters. One of the protests falsely stated that FTR had been terminated on a project at Pierce College. The District informed FTR it planned to honor the protests and reject FTR's bid. This was done in bad faith because the District made the decision before reviewing FTR's responses to the protests.

*Notice of Debarment Hearing*

The District's staff recommended that the FTR Parties be debarred for five years. In a letter dated October 17, 2011, Hall notified the FTR Parties that a committee of the Trustees would hold a hearing in December 2011 to determine whether the FTR Parties should be debarred for up to five years from bidding, contracting, subcontracting or performing work on any District project, and whether the FTR Parties should be found nonresponsible bidders with respect to the Math & Science Complex at East Los Angeles College.

The letter listed the following three charges:

(I) When FTR submitted pay request No. 14 in connection with the Mission Project, the pay request falsely stated that change order No. 1 was 90 percent complete. (II) FTR submitted a false DSA-6 Form for the Allied Project stating that the "entire [Division of the State Architect (DSA)] approved scope is 100 [percent] complete," that all noncompliant work was completed, and that "all construction has, in every material respect, been performed in compliance with the DSA approved documents." (III) FTR failed to construct the exterior envelope of the Allied Project, FTR substituted improper and inadequate materials, and it failed to meet the standard of care in the construction industry.

*The FTR Parties' Ex Parte Application*

FTR filed an ex parte application seeking a temporary restraining order and an order to show cause regarding a preliminary injunction preventing the District from

6

holding a debarment hearing. Also, FTR requested leave to file a second amended complaint to add a cause of action for an injunction enjoining the District from proceeding with the debarment hearing during the pendency of litigation, and a cause of action seeking a declaration from the trial court that the debarment hearing was unconstitutional and illegal.

In support of the application, Katbi submitted a declaration stating that FTR would go out of business if it was debarred.

The ex parte application was denied.

*The FTR Parties' Prehearing Requests; the District's Response*

Via an e-mail to the Board's counsel, David Orbach (Orbach), the FTR Parties requested an opportunity to voir dire the Trustees. Then, in a letter to Orbach, the FTR Parties objected to the Board being the arbiter of the debarment hearing on the grounds of bias. According to the FTR Parties, the Board was biased, inter alia, because of the ongoing litigation between FTR and the District, and because the FTR Parties had been singled out for selective prosecution due to Katbi being an Arab-American of Syrian descent. The FTR Parties requested a hearing before a neutral hearing officer pursuant to Board Rule 71400.40.

Orbach responded by letter and informed the FTR Parties that the District intended to proceed with the hearing as noticed. He indicated that the FTR Parties would not be allowed to voir dire the Trustees.

*The Debarment Hearing Before the Committee*

The debarment hearing was held before a Board committee comprised of Trustee Park and Mona Field (Trustee Field).[8] Trustee Park indicated at the outset that the staff recommendation of debarment would be presented by attorneys Keith Smith and Stewart Reid from the law firm of Wood, Smith, Henning and Berman, and that the committee and Board would be independently advised by Orbach. Camille A. Goulet (Goulet), from the District's Office of the General Counsel, was also present. As the hearing proceeded,

---

[8]     Trustee Field is not a party to the litigation.

7

various witnesses testified. Orbach advised the committee on such issues as how to proceed and how to rule on evidentiary objections. At one point, the FTR Parties' attorney objected to a question, and Orbach stated, "The witness may go ahead and answer."

When the parties finished presenting their evidence and arguments, counsel for the FTR Parties requested findings on their affirmative defenses of estoppel, unclean hands, laches and selective prosecution. Orbach informed the committee that "it would be my recommendation that you do not respond to counsel's request[.]" He went on to provide the committee with written findings. They read the findings into the record, made some modifications, and then voted to adopt the findings and recommend a three-year debarment. As recommended by Orbach, the committee did not rule on the affirmative defenses.

Following the hearing, Orbach prepared a document entitled Committee's Report, Findings and Recommendation.

*The District's Debarment of the FTR Parties*

In February 2013, the full Board convened and considered the recommendation of the committee. Orbach fielded questions from the Trustees regarding the length of the debarment and other matters. The Board voted to debar the FTR Parties for five years.[9] Later, the Board terminated five existing projects with FTR. As a result, the District refused to pay over $10 million that it owed to FTR for work it had completed on those projects.

*FTR's Losses on Projects for Other Entities; FTR Goes out of Business*

At the time of the debarment, FTR had existing projects with the City of Long Beach Board of Harbor Commissioners, the City of Los Angeles Board of Harbor Commissioners, the Signal Hill Redevelopment Agency, the Southern California Regional Rail Authority, the City of Irvine, and the City of La Quinta. Due to the debarment, FTR's creditors placed stop notices on FTR projects and refused to provide

---

[9] While Trustee Field voted yes to debar the FTR Parties for three years, she voted no to debarring them for five years.

8

FTR with credit. It was unable to obtain surety bonds, and therefore it was unable to bid on additional projects. FTR lost millions of dollars in contract balances, change orders, retention and lost profits.

Shortly after the debarment, FTR went out of business. It laid off nearly 300 employees, and its creditors filed claims to recover more than $25 million. Because Katbi personally guaranteed all of FTR's loans, Katbi suffered financial loss, and damage to his reputation and creditworthiness.

*The FTR Parties' New Action*

The FTR Parties filed a combined petition for writ of administrative mandate challenging the debarment order and a complaint for damages. In the complaint, they alleged a federal civil rights claim under section 1983 for violation of due process, and a taxpayer claim under Code of Civil Procedure section 526a. The section 1983 claim sought damages. Both claims sought injunctive and declaratory relief. The Board as well as the Trustees were named as defendants. The case was deemed related to the parties' ongoing litigation in the *Hickman* Action.

Subsequently, the FTR Parties filed the FAC.

*The Trial Court's Decision to Grant FTR's Petition for Writ of Mandate*

The trial court held a hearing on the writ petition and made, inter alia, the following findings: (1) all charges sustained against the FTR Parties by the Board should be found in favor of the FTR Parties; (2) the Board failed to properly consider FTR's equitable defenses; (3) the debarment hearing should have been held before a neutral arbitrator; and (4) there was an unacceptable probability that the Board was biased because any finding in favor of the FTR Parties would have undermined the Board's lawsuit against them. The trial court issued a writ directing the Board to set aside the debarment order. It then ruled that charge III could be relitigated, but charges I and II were barred by equitable estoppel and waiver, and that charge I was also barred by laches.

9

*The First Anti-SLAPP Motion*

The Board and Trustees filed an anti-SLAPP motion to the section 1983 and taxpayer claims and argued, among other things, that they were entitled to qualified immunity on the federal claim. The motion was denied, and the Board and Trustees appealed.

The FTR Parties filed a motion for attorney fees on the grounds that the anti-SLAPP motion was frivolous. The trial court granted the motion and awarded the FTR Parties $72,897.80. Once again, the Board and Trustees appealed.

*The TAC; the Second Anti-SLAPP Motion; the Demurrer*

Pursuant to a stipulation, the eventual second amended complaint was superseded by the TAC. It alleged a second section 1983 claim. It was based on alleged retaliation, inter alia, for Katbi's exercise of his First Amendment right to send the October 5, 2011, letter to the Trustees. Also, the TAC alleged a claim for intentional interference with contract and/or prospective economic advantage, and also a claim for negligence.

The Trustees filed an anti-SLAPP motion to the retaliation, interference and negligence claims. As to the federal claim, they argued that they could not be sued under section 1983 for their official actions and, in any event, they enjoyed absolute quasi-judicial immunity and qualified immunity. As for the state tort claims, the Trustees argued, among other things, that they were entitled to the immunities provided by Government Code sections 820.2 and 820.9, and that the negligence claim was additionally deficient because it did not allege the existence of liability under the Tort Claims Act.

Raising some of the same arguments, the Trustees demurred to multiple claims set forth in the TAC.

Both matters were heard on September 12, 2013.

With respect to the demurrer, the trial court rejected the Government Code immunity defenses on the grounds that they applied only to discretionary policy decisions, and that the debarment at issue was nothing more than an operational decision. The demurrer was sustained with leave to amend with respect to the negligence claim so

10

that the FTR Parties could allege a statutory basis for liability under the Tort Claims Act. In all other respects, the demurrer was overruled. The anti-SLAPP motion was denied.

The District and Trustees appealed.[10]

## DISCUSSION[11]

### I. Standard of Review.

The denial of an anti-SLAPP motion is reviewed de novo. (*Schwarzburd v. Kensington Police Protection & Community Services Dist. Bd.* (2014) 225 Cal.App.4th 1345, 1350 (*Schwarzburd*).) The propriety of an award of attorney fees is reviewed for an abuse of discretion (*Baharian-Mehr v. Smith* (2010) 189 Cal.App.4th 265, 275), but "the determination of whether the trial court had the statutory authority to make such an award is a question of law that we review de novo" (*Carpenter v. Jack in the Box Corp.* (2007) 151 Cal.App.4th 454, 460).

### II. Code of Civil Procedure Section 425.16.

"A cause of action against a person arising from any act of that person in furtherance of the person's right of petition or free speech under the United States Constitution or the California Constitution" under specified categories "shall be subject to a special motion to strike, unless the court determines that the plaintiff has established that there is a probability that the plaintiff will prevail on the claim." (Code Civ. Proc., § 425.16, subd. (b)(1).)

As used in the anti-SLAPP statute, act in furtherance of a person's right of petition or free speech includes, inter alia: (1) any written or oral statement or writing made before a legislative, executive, or judicial proceeding, or any other official proceeding authorized by law, or (2) any written or oral statement or writing made in connection with an issue under consideration or review by a legislative, executive, or judicial body, or any

---

**10** We ordered the three appeals to be consolidated.

**11** The District and Trustees challenge the trial court's order granting the FTR Parties leave to amend their negligence claim. That order, however, was not appealable and is not reviewable in connection with this appeal.

other official proceeding authorized by law. (Code Civ. Proc., § 425.16, subd. (e)(1)-(2); *Briggs v. Eden Council for Hope & Opportunity* (1999) 19 Cal.4th 1106, 1123 [no "'issue of public interest'" limitation].)

If, under the first prong of the analysis, a court determines that a cause of action arises from protected activity, then the burden shifts to the plaintiff to establish a probability of prevailing. (*Navellier v. Sletten* (2002) 29 Cal.4th 82, 88–89 (*Navellier*).) A claim must have at least "minimal merit[.]" (*Id*. at p. 89.) In determining whether there is at least minimal merit, a court will consider the pleadings as well as supporting and opposing declarations stating the facts upon which claims or defenses are based. When assessing the declarations, a court will not weigh credibility, nor will it evaluate the weight of the evidence. Rather, it will accept as true all evidence favorable to the plaintiff and consider the defendant's evidence "'only to determine if it defeats the plaintiff's submission as a matter of law.' [Citation.]" (*Grewal v. Jammu* (2011) 191 Cal.App.4th 977, 989.)

The California Supreme Court has explained that the reach of "[Code of Civil Procedure] section 425.16 extends to statements and writings of governmental entities and public officials on matters of public interest and concern that would fall within the scope of the statute if such statements were made by a private individual or entity." (*Vargas v. City of Salinas* (2009) 46 Cal.4th 1, 17 (*Vargas*).)[12]

---

[12] We note that the United States Supreme Court, in *Nevada Commission on Ethics v. Carrigan* (2011) 131 S.Ct. 2343, 2350 (*Carrigan*), held that a restriction on how legislators vote is not a restriction on their personal free speech rights. This is because "legislative power thus committed is not personal to the legislator but belongs to the people; the legislator has no personal right to it." (*Ibid*.) Given the holding in *Vargas*, *Carrigan* has no impact on the analysis of whether a public official's vote is protected under the anti-SLAPP statute.

**III. In Connection With the Section 1983 Claims, the Trustees Were Sued in Their Official and Individual Capacities**.

As a preliminary matter, we must determine the capacity in which the Trustees were sued under section 1983.

Section 1983 provides: "Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State . . . , subjects . . . any citizen of the United States or other person . . . to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress, except that in any action brought against a judicial officer for an act or omission taken in such officer's judicial capacity, injunctive relief shall not be granted unless a declaratory decree was violated or declaratory relief was unavailable."

A public official can be sued in an official capacity, a personal capacity or both. A personal-capacity suit "seek[s] to impose personal liability upon a government official for actions he takes under color of state law." (*Kentucky v. Graham* (1985) 473 U.S. 159, 165 (*Kentucky*); *Pitts v. County of Kern* (1998) 17 Cal.4th 340, 350 [quoting the rule set forth in *Kentucky*].) An official-capacity suit is another way of "'pleading an action against an entity of which an officer is an agent.' [Citation.]" (*Kentucky, supra,* 473 U.S. at pp. 165–166.) To "establish personal liability in a [section 1983] action, it is enough to show that the official, acting under color of state law, caused the deprivation of a federal right. [Citation.] More is required in an official-capacity action, however, for a governmental entity is liable under [section 1983] only when the entity itself is a '"moving force"' behind the deprivation, [citations]; thus, in an official-capacity suit the entity's 'policy or custom' must have played a part in the violation of federal law. [Citations.]" (*Kentucky*, *supra*, at p. 166, citing *Monell v. New York City Dept. of Social Services* (1978) 436 U.S. 658, 694.)

Because a state is not a person under section 1983, an official capacity claim against a state does not lie for damages. But an official capacity claim for prospective relief will lie because, under sovereign immunity doctrine, such a claim is not treated as

13

against the state. (*Will v. Michigan Department of State Police* (1989) 491 U.S. 58, 64–69, 71, fn. 10.) A damages action against a California school district is considered an action against the state. (*Kirchmann v. Lake Elsinore Unified School Dist.* (2000) 83 Cal.App.4th 1098, 1110; *Mitchell v. Los Angeles Community College District* (9th Cir. 1988) 861 F.2d 198, 201–202.)

"In many cases, the complaint will not clearly specify whether officials are sued personally, in their official capacity, or both. 'The course of proceedings' in such cases typically will indicate the nature of the liability sought to be imposed. [Citation.]" (*Kentucky*, *supra*, 473 U.S. at p. 167, fn. 14.)

Turning to the FAC, we note that the procedural due process claim and the prayer did not allege the capacity in which the Trustees were sued, but it is apparent they were sued in both their individual and official capacities because the claim sought damages (only recoverable against the Trustees in their individual capacities) and injunctive relief (only obtainable against the Board). (*Hafer v. Melo* (1991) 502 U.S. 21, 22–23, 27 [a public official sued in his or her personal capacity under section 1983 can be held liable for damages arising from their official acts]; *Ahanotu v. Massachusetts Turnpike Auth.* (D. Mass. 2006) 466 F.Supp.2d 378, 398 ["An individual acting in his or her official capacity may be sued for prospective injunctive relief to end an ongoing constitutional violation, or can be sued in his or her individual capacity for money damages"];17A Moore's Federal Practice - Civil (2015) § 123.40[b][1] (Matthew Bender) ["even if the officer performed official functions when the alleged harm occurred, the suit is an individual-capacity suit if the plaintiff seeks a damage award against the officer personally"].)[13]

---

[13] In connection with their argument concerning the first section 1983 claim, the Trustees cite *Brunius v. Parrish* (2005) 132 Cal.App.4th 838 (*Brunius*) for the proposition that official actions do not support individual capacity claims. However, *Brunius* did not decide that issue because it was forfeited (*id.* at p. 859), and cases are not authority for issues not decided. (*Consumers Lobby Against Monopolies v. Public Utilities Com.* (1979) 25 Cal.3d 891, 902.)

The First Amendment retaliation claim, which was first set forth in the TAC, alleged that FTR and Katbi are entitled "to general and compensatory damages . . . against each defendant in his or her individual capacity, and injunctive and declaratory relief against each individual defendant in his or her official capacity." The pleading was unequivocal. The Trustees were sued in both their individual and official capacities.[14]

## IV.  The Personal Capacity Section 1983 Claims.

A.  No Forfeiture of Issues Raised Below; No Forfeiture of Legal Issues.

In their first anti-SLAPP motion, the District and Trustees argued that FTR Parties were trying to chill future speech and conduct, the District was not a person subject to liability under section 1983, and the Trustees were entitled to qualified immunity for their actions. Only in their reply brief did the District and Trustees argue that the protected activity supporting the anti-SLAPP motion was the conduct of the Trustees in connection with the debarment proceedings, and that the Trustees were entitled to absolute quasi-judicial immunity. The trial court considered both of those arguments to be forfeited because they were not asserted in the moving papers.

FTR urges us to disregard the same arguments the trial court refused to consider. We decline. Our review is de novo, and the issues raised in the papers below have been fully briefed on appeal. Regardless, we have the discretion to consider all legal issues raised by the parties for the first time on appeal. (*Concepcion v. Amscan Holdings, Inc.* (2014 ) 223 Cal.App.4th 1309, 1324.)

---

[14]     With respect to the second section 1983 claim, the Trustees cite our opinion in *McAllister v. Los Angeles Unified School Dist.* (2013) 216 Cal.App.4th 1198 (*McAllister*) to establish that the TAC did not allege an individual capacity claim. But in *McAllister*, the appellant did not argue that the form of relief sought—and whether it was obtainable against the public official or the state—was a relevant inquiry, so we did not analyze that issue. In the case at bar, we are confronted with that issue and conclude that the relief sought is a relevant inquiry when determining whether a public official has been sued in his or her official or individual capacity, or both.

15

B.  The Anti-SLAPP Statute Applies to the Personal Capacity Claims.

1.  *The Personal Capacity Claims Arise Out of the Trustees' Protected Activity of Casting Votes*.

With respect to the First Amendment retaliation claim, the parties agree that the personal capacity claim arises out of the Trustees' votes to debar the FTR Parties. However, they debate whether the procedural due process claim also arises out of the Trustees' votes, and they debate whether the votes of public officials qualify as protected activity under the anti-SLAPP statute.

We turn, first, to the basis of the procedural due process claim.  This requires us to pinpoint the claim's principal thrust.  (*Martinez v. Metabolife Internat., Inc.* (2003) 113 Cal.App.4th 181, 188.)

As to each Trustee, the FAC generally alleged that the Trustees "violated the due process rights of FTR . . . , not only by voting on February 8, 2012[,] to find [FTR] to be non-responsible bidders and debar them from bidding on [District] projects but by acting arbitrarily and without factual or legal justification to bar them for 5 years rather than the 3-year period recommended by the Board's committee that presided over the evidentiary hearing on the charges against FTR[.]"  In addition, the FAC averred that in the process of debarring FTR, the Board and Trustees denied FTR due process by, among other actions, (1) harboring actual bias toward FTR; (2) making arbitrary decisions; and (3) making findings and conclusions in a manner that amended the debarment charges without first affording FTR the chance to respond to the amended charges.  All of these allegations were incorporated by reference into the claim for violation of procedural due process.

As to damages, the procedural due process claim alleged:  "As a direct and proximate result of defendants' unlawful actions as alleged herein, plaintiffs have incurred and will incur economic damage and losses, lost business opportunity, damage to professional and personal reputation, and plaintiff Katbi has suffered severe emotional distress and other injuries, thus entitling plaintiffs to general and compensatory damages in amounts to be proven at trial."  The claim also alleged that the FTR Parties were

16

entitled to punitive damages because the Trustees acted in conscious disregard of the FTR Parties' rights.

The FTR Parties contend that the principal thrust of this claim is that the Trustees denied them procedural due process in connection with the hearing, processing and deciding of the three charges. We disagree. The Trustees' votes are what led to FTR being debarred for five years and suffering damages. (*Vergos v. McNeal* (2007) 146 Cal.App.4th 1387, 1397 (*Vergos*) [cause of action arose out of hearing officer's "communicative conduct in denying plaintiff's grievances"].) Moreover, the "hearing, processing and deciding of the [debarment issues was] meaningless without a communication of the adverse results." (*Ibid.* [rejecting the trial court's rationale that a cause of action did not arise from protected activity because it was based on a hearing officer's "conduct and not on the content of what she stated in any proceeding or in the exercise of the right to petition"].)

It is relevant to note that a plaintiff suing on a section 1983 claim may not, generally speaking, obtain a compensatory damages award absent actual injury. (*Farrar v. Hobby* (1992) 506 U.S. 103, 112.) However, a plaintiff may sue for nominal damages when it has been denied procedural due process. (*Ibid.*) "The awarding of nominal damages for the 'absolute' right to procedural due process 'recognizes the importance to organized society that [this] right be scrupulously observed' while 'remaining true to the principle that substantial damages should be awarded only to compensate actual injury.' [Citation.]" (*Ibid.*) Because this personal capacity claim seeks compensatory rather than nominal damages against the Trustees, it is apparent that the FTR Parties' main focus is compensation for actual injury caused by the votes rather than, for the sake of principle, an attack on how the debarment hearing was conducted.[15] To bolster our point, we note

---

[15] A debarment proceeding implicates a liberty interest. (*Southern Cal. Underground Contractors, Inc. v. City of San Diego* (2003) 108 Cal.App.4th 533, 542 (*Underground Contractors*).) In essence, the FTR Parties claim that they were deprived of that interest by the debarment.

that the FTR Parties did not sue Trustee Field even though she contributed to the denial of procedural due process

Next, we resolve whether the Trustees' votes are protected activity under Code of Civil Procedure section 425.16, subdivision (e).

The answer is provided by *Schwarzburd*. It held that board members of a public agency who were sued because of how they voted were entitled to the protections of the anti-SLAPP statute. (*Schwarzburd*, *supra*, 225 Cal.App.4th at pp. 1354–1355.) Under the clear import of *Schwarsburd*, the Trustees' votes are, indeed, protected activity. Urging us to find against anti-SLAPP protection, the FTR Parties rely on *City of Montebello v. Vasquez* (2014) 226 Cal.App.4th 1084 (*Montebello*). In *Montebello*, the court held that a city council member's votes and acts of governance, without more, are not exercises of free speech or petition and therefore do not fall within the scope of the anti-SLAPP statute. (*Id.* at p. 1092.) The FTR Parties' reliance is misplaced. On August 13, 2014, our Supreme Court granted a request to depublish *Montebello* at the same time that it denied a request to depublish *Schwarzburd*. (*City of Montebello v. Vasquez* (2014) 330 P.3d 329 [175 Cal.Rptr.3d 252]; *Schwarzburd v. Kensington Police Protection & Community Services Dist. Bd.* (Aug. 13, 2014, S219175) ___ Cal.4th ___ [2014 Cal. Lexis 5520].) Given that our Supreme Court has depublished *Montebello*, it is not permissible for us to consider that opinion.

2. *Public Policy Does not Bar the Application of the Anti-SLAPP Statute to the Personal Capacity Claims*.

Even if the votes would otherwise fit within the scope of the language in Code of Civil Procedure section 425.16, subdivision (e), the FTR Parties argue that public policy dictates that the anti-SLAPP statute have no application. In their view, applying the anti-SLAPP statute here would encourage public officials to insulate their wrongful actions by having a local political body vote to approve of their misconduct. This argument fails because the damage would flow from the misconduct, not the vote, and the anti-SLAPP statute would not be triggered by the artifice of that vote.

18

Alternatively, the FTR Parties argue that protecting the votes of public officials would chill the right of citizens to challenge unlawful government conduct, and for that reason the anti-SLAPP statute should not apply.  But the cases cited by the FTR Parties— *USA Waste of California, Inc. v. City of Irwindale* (2010) 184 Cal.App.4th 53 (*USA Waste*) and *Graffiti Protective Coatings, Inc. v. City of Pico Rivera* (2010) 181 Cal.App.4th 1207 (*Graffiti Protective Coatings*)—are inapposite because they involved actions against public entities rather than public officials and therefore were impacted by different policy considerations.

*USA Waste* noted that "[a]ctions to enforce, interpret or invalidate governmental laws generally are not subject to being stricken under the anti-SLAPP statute.  If they were, efforts to challenge governmental action would be burdened significantly."  (*USA Waste*, *supra*, 184 Cal.App.4th at p. 65.)  Citing *San Ramon Valley Fire Protection Dist. v. Contra Costa County Employees' Retirement Assn.* (2004) 125 Cal.App.4th 343, 357– 358 (*San Ramon*), *Graffiti Protective Coatings* pointed out that "if a special motion to strike could be brought in every case where a petition for mandate seeks to challenge a government decision, then suits to compel public entities to comply with the law would be chilled."  (*Graffiti Protective Coatings*, *supra*, 181 Cal.App.4th at pp. 1219–1220.) *San Ramon* involved a suit by a fire protection district challenging a decision by a retirement board to increase contributions to support increased benefits.  It held that the retirement board's action did not constitute protected activity, reasoning:  "To decide otherwise would significantly burden the petition rights of those seeking mandamus review for most types of governmental action.  Many of the public entity decisions reviewable by mandamus or administrative mandamus are arrived at after discussion and a vote at a public meeting.  [Citations.]  If mandamus petitions challenging decisions reached in this manner were routinely subject to a special motion to strike . . . [,] the petitioners in every such case could be forced to make a prima facie showing of merit at the pleading stage.  While that result might not go so far as to impliedly repeal the mandamus statutes . . . , it would chill the resort to legitimate judicial oversight over potential abuses of legislative and administrative power, which is at the heart of those

19

remedial statutes.  It would also ironically impose an undue burden upon the very right of petition for those seeking mandamus review in a manner squarely contrary to the underlying legislative intent behind [Code of Civil Procedure] section 425.16." (*San Ramon*, *supra*, 125 Cal.App.4th at p. 357.)

Giving anti-SLAPP protection to the votes of public officials as opposed to the action of a public entity will not chill the ability of citizens to challenge governmental action.  Under *USA Waste*, *Graffiti Protective Coatings* and *San Ramon*, public entities can still be sued without the burden of the anti-SLAPP statute.  Thus, we decline to strip public officials of anti-SLAPP protection.

3.  *The Illegality Exception Does not Apply*.

The FTR Parties urge us to conclude that the anti-SLAPP statute does not protect unconstitutional votes.  They rely on *Flatley v. Mauro* (2006) 39 Cal.4th 299, 320 (*Flatley*), which stated that "where a defendant brings a motion to strike under [Code of Civil Procedure] section 425.16 based on a claim that the plaintiff's action arises from activity by the defendant in furtherance of the defendant's exercise of protected speech or petition rights, but either the defendant concedes, or the evidence conclusively establishes, that the assertedly protected speech or petition activity was illegal as a matter of law, the defendant is precluded from using the anti-SLAPP statute to strike the plaintiff's action."  As a counterpunch, the Trustees claim that the *Flatley* rule applies only to criminal conduct.

We agree with the Trustees.

Our Supreme Court has not elucidated whether the illegality exception is limited to criminal conduct, or whether it can be extended to noncriminal conduct that is unlawful in the sense that it violates a principle of constitutional, statutory or common law.  However, as observed in *Fremont Reorganizing Corp. v. Faigin* (2011) 198 Cal.App.4th 1153, 1169 (*Fremont Reorganizing*), multiple "Court of Appeal opinions have rejected attempts to apply the rule from *Flatley* . . . to noncriminal conduct."  The court concluded that the rule from *Flatley* "is limited to criminal conduct."  (*Fremont Reorganizing*, *supra*, 198 Cal.App.4th at p. 1169.)  One of the

20

decisions cited was *Mendoza v. ADP Screening & Selection Services, Inc.* (2010) 182 Cal.App.4th 1644 (*Mendoza*). It concluded that "the Supreme Court's use of the phrase 'illegal' [in *Flatley*] was intended to mean criminal, and not merely violative of a statute." (*Mendoza*, *supra*, 182 Cal.App.4th at p. 1654.) The *Mendoza* court added that "a reading of *Flatley* to push any statutory violation outside the reach of the anti-SLAPP statute would greatly weaken the constitutional interests which the statute is designed to protect. As [the defendant] correctly observes, a plaintiff's complaint *always* alleges a defendant engaged in illegal conduct in that it violated some common law standard of conduct or statutory prohibition, giving rise to liability, and we decline to give plaintiffs a tool for avoiding the application of the anti-SLAPP statute merely by showing any statutory violation." (*Mendoza*, *supra*, at p. 1654.)

We conclude that the reasoning in *Fremont Reorganizing* and *Mendoza* is sound, and that those cases should be followed.

4. *The Anti-SLAPP Statute is not Preempted by the Supremacy Clause*.

The FTR Parties contend that that application of the anti-SLAPP statute to the federal civil rights claims is barred by conflict and obstacle preemption. This contention does not withstand scrutiny.

"The supremacy clause of the United States Constitution establishes a constitutional choice-of-law rule, makes federal law paramount, and vests Congress with the power to preempt state law. [Citations.]" (*Viva! Internat. Voice for Animals v. Addidas Promotional Retail Operations, Inc.* (2007) 41 Cal.4th 929, 935 (*Viva!*).) Conflict preemption is triggered "when simultaneous compliance with both state and federal directives is impossible. [Citations.]" (*Viva!*, *supra*, 41 Cal.4th at p. 936.) Obstacle preemption arises in a particular case when a state law frustrates the objectives of Congress. (*Ibid.*)

There is no conflict preemption here. The anti-SLAPP statute prescribes no procedures for debarment hearings, and therefore it does not make it impossible for the Trustees to comply with either the requirements of procedural due process when

21

conducting debarment hearings or the requirements of section 1983. The FTR Parties offer no argument to the contrary.

This brings us to obstacle preemption.

Congress enacted section 1983 "in response to the patent inadequacy of state enforcement of constitutional guarantees for the newly enfranchised black citizenry." (*Williams v. Horvath* (1976) 16 Cal.3d 834, 841 (*Williams*).) Its purpose is "to serve as an antidote to discriminatory state laws, to protect federal rights where state law is inadequate, and to protect federal rights where state processes are available in theory but not in practice[.]" (*Ibid.*) This purpose "may not be frustrated by state substantive limitations couched in procedural language." (*Ibid.*; *County of Los Angeles v. Superior Court* (2006) 139 Cal.App.4th 8, 17 ["Although federal law controls the substantive aspects of plaintiffs' federal civil rights claim, state rules of evidence and procedure apply unless application of those rules would affect plaintiffs' substantive federal rights"].) For example, the *Williams* court held that the claim filing requirement in the Government Tort Claims Act "is inoperative in an action brought under section 1983" because that provision "'is more than a procedural requirement, it is a condition precedent to [the plaintiff] maintaining an action against [the] defendants[,]'" and is "'an integral part of [the] plaintiff's cause of action.'" (*Williams*, *supra*, 16 Cal.3d at p. 842.)

California appellate courts have held that the anti-SLAPP statute is applicable to claims brought in state court pursuant to section 1983. (*Vergos*, *supra*, 146 Cal.App.4th at p. 1392, fn. 4 ["Federal civil rights claims brought in California state courts are subject to [Code Civ. Proc., § 425.16 motions"]; *Bradbury v. Superior Court* (1996) 49 Cal.App.4th 1108, 1117–1118 [holding that Code Civ. Proc., § 425.16 applies to a federal civil rights cause of action, and rejecting the argument that Code Civ. Proc., § 425.16 "violates federal substantive law"].) We opt to follow the lead of prior Court of Appeal decisions because an anti-SLAPP motion is neither a condition precedent to nor an integral part of a lawsuit under section 1983.

To combat California precedent, the FTR Parties cite federal cases that relied on an *Erie*[16] doctrine analysis or the preemptive effect of the Bankruptcy Code when holding that the anti-SLAPP statute did not apply to federal claims in federal court. (*Globetrotter Software, Inc. v. Elan Computer Group, Inc.* (N.D. Cal. 1999) 63 F.Supp.2d 1127, 1128–1130 [under the *Erie* doctrine, the anti-SLAPP statute applies to pendant state claims but not federal claims brought in federal court]; *Bulletin Displays, LLC v. Regency Outdoor Adver., Inc.* (C.D. Cal. 2006) 448 F. Supp. 2d 1172, 1182 (*Bulletin Displays*) [same];[17] *Restaino v. Bah* (*In re Bah*) (Bankr. 9th Cir. 2005) 321 B.R. 41, 46 [impliedly holding that the Bankruptcy Code preempts the application of the anti-SLAPP statute to federal claims in bankruptcy court]; *Riese v. County of Del Norte* (case No. 12 CV-03723-WHO, N.D. Cal. 2013) 2013 U.S. Dist. LEXIS 126351 [the anti-SLAPP statute inapplicable to federal claims in federal court].) Because the *Erie* doctrine and the Bankruptcy Code are not implicated, these cases are inapposite.

5. *The Fourteenth Amendment Does not Prevent Anti-SLAPP Protection.*

The FTR Parties argue that conduct cannot be simultaneously protected by the First Amendment and prohibited by the Fourteenth Amendment and, as a consequence, the Trustees cannot invoke the anti-SLAPP statute. Impliedly, they suggest that the anti-

---

**16**      *Erie R.R. v. Tompkins* (1938) 304 U.S. 64 (*Erie*).

**17**      In *Bulletin Displays*, the defendant argued that the "failure to apply the anti-SLAPP statute to federal causes of action that could also be brought in state court would contravene *Erie*'s holding that, in a diversity suit, state substantive law must be applied to prevent 'forum shopping.'" (*Bulletin Displays*, *supra*, 448 F.Supp.2d at p. 1181.) The court rejected this argument because *Erie* "has no application to federal question claims, only to state law claims in diversity actions and pendent state law claims in federal question cases." (*Ibid.*) In dicta, the court stated without deciding, "Moreover, as the anti-SLAPP statute has been described as establishing a rule of 'substance,' rather than procedure, [*New.Net, Inc. v. Lavasoft* (C.D. Cal. 2004) 356 F.Supp.2d 1090, 1099 (*New.Net*)], applying it to federal claims arguably would permit state law to affect and alter the substance of federal claims in violation of the Supremacy Clause of the Constitution." (*Bulletion Displays*, *supra*, 448 F.Supp.2d at pp. 1181–1182.) This dicta is not persuasive because *New.Net* was an *Erie* doctrine case, and it therefore does not support a finding that the anti-SLAPP statute is substantive under a preemption analysis. (*New.Net*, *supra*, 356 F.Supp.2d at p. 1099.)

23

SLAPP statute does not apply because the Trustees' votes have been stripped of First Amendment protection by the Fourteenth Amendment. They make this argument in connection with their discussion of preemption, yet this cannot possibly be a preemption issue because it does not involve a conflict between state and federal law. Rather, as posed, it involves a conflict between two amendments to the United States Constitution. We therefore address this issue separately.

In support of their novel argument, the FTR Parties cite a single case, *United States v. Yonkers* (2nd Cir. 1988) 856 F.2d 444, 457 (*Yonkers*). In *Yonkers*, city council members were held in contempt of court for failing to vote in compliance with an order directing the city to adopt legislation designed to remedy racial segregation in housing and schools. (*Yonkers*, *supra*, 856 F.2d at pp. 447–452.) On appeal, the city council members asserted a First Amendment defense. The *Yonkers* court rejected the defense, stating: "Even if we acknowledge that the act of voting has sufficient expressive content to be accorded some First Amendment protection as symbolic speech, the public interest in obtaining compliance with federal court judgments that remedy constitutional violations unquestionably justifies whatever burden on expression has occurred. [Citation.] The council members remain free to express their views on all aspects of housing in Yonkers. But just as the First Amendment would not permit them to incite violation of federal law, [citations], it does not permit them to take action in violation of such law[.]" (*Yonkers, supra,* at p. 457.)

We find nothing in *Yonkers* that is relevant here. It does not stand for the proposition that a state statute cannot require a prima facie showing of merit before a claim arising from certain categories of speech goes forward. Rather, *Yonkers* simply establishes that the First Amendment will not be a defense if policy demands that free speech rights yield to other considerations.

C. There is no Probability of Prevailing on the Procedural Due Process Claim.

The Trustees contend that they are entitled to qualified immunity with respect to the due process claim. This contention bears out.

24

"[G]overnment officials performing discretionary functions, generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known. [Citations.]" (*Harlow v. Fitzgerald* (1982) 457 U.S. 800, 818.) "Qualified immunity balances two important interests—the need to hold public officials accountable when they exercise power irresponsibly and the need to shield officials from harassment, distraction, and liability when they perform their duties reasonably. The protection of qualified immunity applies regardless of whether the government official's error is 'a mistake of law, a mistake of fact, or a mistake based on mixed questions of law and fact.' [Citation.]" (*Pearson v. Callahan* (2009) 555 U.S. 223, 231.)

When examining qualified immunity, a court must determine whether the state of the law at the time of the constitutional deprivation gave officials fair warning that particular conduct was unconstitutional. (*Ellins v. City of Sierra Madre* (9th Cir. 2013) 710 F.3d 1049, 1064 (*Ellins*); *Eng v. Cooley* (9th Cir. 2009) 552 F.3d 1062, 1075 ["For a constitutional right to be clearly established, 'its contours "must be sufficiently clear that a reasonable official would understand that what he is doing violates that right"' at the time of his conduct"].)

California case law provides that the standard of impartiality required at an administrative hearing is less exacting than what is required in a judicial proceeding. (*Nasha v. City of Los Angeles* (2004) 125 Cal.App.4th 470, 483 (*Nasha*).) According to *Nasha*, "It is recognized that 'administrative decision makers are drawn from the community at large. Especially in a small town setting they are likely to have knowledge of and contact or dealings with parties to the proceeding. Holding them to the same standard as judges, without a showing of actual bias or the probability of actual bias, may discourage persons willing to serve and may deprive the administrative process of capable decision makers.' [Citation.]" (*Ibid.*) Thus, "in order to prevail on a claim of bias violating fair hearing requirements," a plaintiff "must establish '"an unacceptable probability of actual bias on the part of those who have actual decisionmaking power over their claims."'" [Citation.]" (*Ibid.*)

In *Underground Contractors,* the court explained, "'[B]ias in an administrative hearing context can never be implied, and the mere suggestion or appearance of bias is not sufficient. [Citation.] It is also well established that a party is not denied an impartial adjudicator merely because an administrative entity performs both the functions of prosecutor and judge. [Citation.] Overlapping investigatory, prosecutorial and adjudicatory functions do not necessarily deny a fair hearing and are common before most administrative boards. [Citations.]' [Citation.]" (*Underground Contractors*, *supra*, 108 Cal.App.4th at p. 549.) With these considerations in mind, the *Underground Contractors* court held that city council members who were presiding over a debarment hearing were not per se biased because the contractor had sued the city. The court noted that the city council members had no pecuniary interest in the lawsuit, and it concluded by stating that when "'an administrative body has a duty to act, and is the only entity capable of acting, the fact that the body may have an interest in the result does not disqualify it from acting. The rule of necessity precludes a claim of bias from the structure of the process.' [Citation.]" (*Id*. at p. 550.)

Given *Nasha* and *Underground Contractors*, and given the absence of any cases prohibiting the Trustees from presiding over a debarment hearing in this factual context, they contend that they could not have known that authorizing a cross-complaint in the *Hickman* Action disqualified them from presiding over the debarment hearing. The FTR Parties, on the other hand, contend that the Trustees violated the clearly established rule that a contractor facing debarment has a constitutional right to an impartial decision maker. (*Golden Day School, Inc. v. State Dept. of Education* (2000) 83 Cal.App.4th 695, 709 (*Golden Day*).)

There was no evidence of actual bias presented in connection with the first anti-SLAPP motion, which predated the First Amendment retaliation claim. At most, this is a "probability of bias" case. While there is a general rule set forth in *Golden Day* requiring that a decision maker be impartial, there are no state or federal cases, nor are there any statutes, specifically on point. The emergent question, then, is whether the Trustees should have known that procedural due process required that they recuse themselves from

26

the debarment hearing because there was an unacceptable probability of bias. We think not. They are called upon to conduct the District's business and make decisions about contractors and projects. Undeniably, they have overlapping investigatory and adjudicatory function. Per the *Underground Contractors* court, such an overlapping of function does not necessarily deny a fair hearing. Significantly, as that case establishes, litigation between a public agency and an administrative litigant does not disqualify the public agency from acting. Assuming without deciding that constitutional law required the Trustees to disqualify themselves, it goes too far to charge the Trustees with that knowledge. If they made a mistake of law, it was not so obvious as to defeat qualified immunity. This is because the precise contours of due process in the administrative context are flexible and ever evolving.

We reach the same conclusion regarding the Trustees' failure to rule on affirmative defenses. The FTR Parties have not cited any cases that required a ruling, and we are aware of none. A review of the administrative record reveals that they were permitted to present evidence on their affirmative defenses, and the Trustees voted based on the entire record. This procedure allowed the FTR Parties to preserve their affirmative defenses for judicial review. While the FTR Parties were entitled to procedural safeguards, "there [was] no constitutional entitlement to the full panoply of judicial trial procedures" (*Underground Contractors*, *supra*, 108 Cal.App.4th at pp. 542–543). Thus, assuming the law required a ruling on the affirmative defenses, the Trustees cannot be charged with anticipating such a rule.

D. There is a Probability of Prevailing on the Retaliation Claim.

When a plaintiff sues public officials under section 1983 and alleges retaliation for the exercise of First Amendment rights, the plaintiff "must establish that (1) it engaged in expressive conduct that addressed a matter of public concern; (2) the government officials took an adverse action against it; and (3) its expressive conduct was a substantial or motivating factor for the adverse action. [Citation.]" (*Alpha Energy Savers, Inc. v. Hansen* (9th Cir. 2004) 381 F.3d 917, 923 (*Alpha*).)

### 1. *Expressive Conduct that Addressed a Matter of Public Concern.*

Whether "speech addresses a matter of public concern must be determined by the content, form, and context of a given statement, as revealed by the whole record." (*Connick v. Myers* (1983) 461 U.S. 138, 147, 148 [stating test for analyzing "[w]hether an employee's speech addresses a matter of public concern"].) Speech involves matters of public concern when it relates to any matter of political, social, or other concern to the community, or when it is a subject of legitimate news interest. (*Lane v. Franks* (2014) 134 S.Ct. 2369, 2380; *Snyder v. Phelps* (2011) 562 U.S. 443, 452 [131 S.Ct. 1207, 1216] ["'[s]peech deals with matters of public concern when it can 'be fairly considered as relating to any matter of political, social, or other concern to the community,'" or when it "'is a subject of legitimate news interest'"].) "On the other hand, speech that deals with 'individual personnel disputes and grievances' and that would be of 'no relevance to the public's evaluation of the performance of governmental agencies' is generally not of 'public concern.' [Citation.]" (*Coszalter v. City of Salem* (9th Cir. 2003) 320 F.3d 968, 973 (*Coszalter*).)

When government employees speak about corruption, wrongdoing, misconduct or wastefulness by other government employees, that speech is a matter of public concern. (*Alpha*, *supra*, 381 F.3d at p. 926.) This "rule applies to invidious discrimination as well—whether it consists of a single act or a pattern of conduct. Disputes over racial, religious, or other such discrimination by public officials are not simply individual personnel matters. They involve the type of governmental conduct that affects the societal interest as a whole—conduct in which the public has a deep and abiding interest. Litigation seeking to expose such wrongful governmental activity is, by its very nature, a matter of public concern." (*Id.* at pp. 926–927.)

We conclude that Katbi's letter dated October 5, 2011, was a matter of public concern because it sought to expose racism, retaliation, corruption and fraud by Payinda in connection with a public project, and because it accused the District of acting in bad faith when rejecting a low bid. Also, the letter responded to newspaper articles, which

28

demonstrated that the topic of the FTR Parties' reputation and performance on public contracts was newsworthy.

### 2. *Adverse Action.*

The trustees voted to debar the FTR Parties. That qualifies as adverse action because it is reasonably likely to deter their complaints about government corruption and misconduct. (*Coszalter*, *supra*, 320 F.3d at p. 970 [in a First Amendment retaliation case, an adverse action "is an act that is reasonably likely to deter" a person "from engaging in constitutionally protected speech"].)

The Trustees contend that due to the trial court's decision to grant the petition for writ of mandate and undo the debarment, there is no official action upon which the FTR Parties' claim can be based. They cite *Martinez v. California* (1980) 444 U.S. 277 (*Martinez*) and *Ketchum v. County of Alameda* (9th Cir. 1987) 811 F.2d 1243 (*Ketchum*) but neither case is apposite.

In *Martinez*, a teenage girl was murdered by a parolee. Her survivors sued the parole board under section 1983 and alleged that when it released the parolee, it subjected the girl to a deprivation of life without due process of law. The court rejected the theory on the grounds that the girl's death was too remote a consequence of the parole board's actions. In particular, the court noted that the parolee was not an agent of the parole board, and the parole board was not aware that the girl faced any special danger. (*Martinez, supra,* 444 U.S. at pp. 284–285.)

After the plaintiff in *Ketchum* was raped by an inmate who escaped from a rehabilitation facility, she sued various entities and officers under section 1983. She claimed that they were grossly negligent in failing to maintain security, and they therefore deprived her of the constitutional right to privacy and security of property. (*Ketchum*, *supra*, 811 F.2d at p. 1244.) Citing *Martinez*, the *Ketchum* court held the plaintiff did not have a viable federal civil rights claim because the state did not deprive her of a constitutional right. (*Ketchum*, *supra*, at p. 1247.)

The Trustees' votes led directly to the FTR Parties' injuries, so it cannot reasonably be argued that their actions were too remote. In reaching this conclusion, we

reject the Trustees' suggestion that they cannot be held liable because it was the District that debarred FTR, not them. It was explained in *Gilbrook v. City of Westminster* (9th Cir. 1999) 177 F.3d 839, 854 (*Gilbrook*) that anyone who causes a citizen to be subjected to a constitutional deprivation is liable under section 1983. The "'requisite causal connection can be established not only by some kind of direct personal participation in the deprivation, but also by setting in motion a series of acts by others which the actor knows or reasonably should know would cause others to inflict the constitutional injury.' [Citation.]" (*Gilbrook*, *supra*, 177 F.3d at p. 854.)

To the degree the Trustees suggest that the writ of mandate erases any misconduct, the suggestion lacks legal support.

### 3. *Substantial or Motivating Factor*.

Federal law establishes that to prove that First Amendment "retaliation was a substantial or motivating factor behind an adverse employment action, a plaintiff may introduce evidence that (1) the speech and adverse action were proximate in time, such that a jury could infer that the action took place in retaliation for the speech; (2) the employer expressed opposition to the speech, either to the speaker or to others; or (3) the proffered explanations for the adverse action were false and pretextual." (*Ellins, supra,* 710 F.3d at p. 1062.)

Here, in a letter dated October 17, 2011, the District notified FTR and Katbi that the Board would be holding a hearing in December 2011 to determine whether to debar them for up to five years. That letter was issued soon after Katbi's October 5, 2011, letter. On January 10, 2012, after a hearing, the Trustees' committee recommended debarment. Less than a month later, the Trustees voted to debar FTR for five years. Because the District's letter, the recommendation and the debarment were so close in time to Katbi's letter, a jury could infer that the decision to hold a hearing and consider debarment was retaliation for Katbi's speech. (*Coszalter*, *supra*, 320 F.3d at p. 978 [adverse action taking place three to eight months after the plaintiff speech supports an inference of retaliation].)

Other facts bolster the inference of retaliation.

For example, the committee report stated: "FTR . . . argues that it was targeted by [Payinda] and that [Payinda] made racist remarks about FTR including referring to it as 'sand niggers and towel heads.' The Committee finds such language patently offensive and inexcusable. [Payinda], the person who FTR alleges said such things, vehemently denies he ever made such comments. . . . The Committee also notes that FTR made the exact same allegations on another public works project for the Rio School District in Oxnard, California[,] which took place over 10 years ago. . . . [¶] . . . [¶] While the District would never condone any racist conduct, it is difficult for the Committee to believe that on two completely separate projects in two different counties and years apart, two different persons would undertake to reject work and harass FTR based solely on racial bias[,] and that these two persons would use identical racist remarks against FTR. However distasteful such comments are, what is also distasteful is a contractor's apparent practice of using the allegation of racism to deflect responsibility for the quality of its work." Thus, it is apparent that the committee expressed opposition to some of Katbi's statements.

Furthermore, in the context of the other facts mentioned, the Board conducted the debarment proceeding in a manner suggesting that it stacked the deck against the FTR Parties. It refused a continuance that would have enabled the FTR Parties to prepare an expert regarding charge III; at the committee hearing on January 10, 2012, the committee members failed to discuss the elements of fraud; the committee members refused to rule on the affirmative defenses; and the Trustees voted to debar for five years instead of following the committee recommendation that the FTR Parties be debarred for only three years.

To block our consideration of the letter, the Trustees cite *Continental Ins. Co. v. Lexington Ins. Co*. (1997) 55 Cal.App.4th 637, 646 [a plaintiff is not "allowed to amend the complaint to state a fact directly contradictory to one stated previously"], *Vallejo Development Co. v. Beck Development Co.* (1994) 24 Cal.App.4th 929, 946 ["a court is "'not bound to accept as true allegations contrary to factual allegations in former pleading in the same case"'"], and *Deveny v. Entropin, Inc.* (2006) 139 Cal.App.4th 408, 425–426

[allegations in the original complaint rendering it vulnerable to demurrer cannot be omitted without explanation]. According to the Trustees, the FAC and the TAC are fatally inconsistent regarding the motive for debarment, i.e., whether it was motivated by the Los Angeles Times articles or Katbi's letter.

We perceive no inconsistency. The FAC alleged facts related to the Los Angeles Times articles, but it did not allege that the debarment was motivated by those articles. At most, the FAC could be construed as implying that the articles were a motivating factor. That does not contradict the allegation in the TAC that the debarment was retaliation for Katbi's letter. The Trustees' real complaint seems to be that the TAC is inconsistent with the FTR Parties' ex parte application for a temporary restraining order/ injunction and motion for peremptory writ, in which they argued that the articles prompted an investigation, and that the Board debarred the FTR Parties to obtain good press. But the Trustees have cited no rule that would penalize the FTR Parties by forbidding them from alleging something different in a subsequently amended complaint. And, in any event, the FTR Parties never argued that the Los Angeles Times articles were the only motivating factor, which allows room for additional motivating factors.

The Trustees' next argument is also unavailing. They posit that there is no likelihood of the FTR Parties prevailing because the evidence does not suggest that the District's staff was motivated by Katbi's letter to recommend debarment proceedings. But a press release from the District indicated that the Board had sent letters to two major District contractors instituting proceedings that could potentially terminate their contracts with the District's building program. Also according to the press release, which was issued after Katbi's October 5, 2011, letter was sent, the Board had instructed its Chancellor to take whatever actions were necessary to reform the building program, root out mismanagement and waste, and ensure that taxpayers were getting full value for the money invested in community college campuses. From the timing of the letter, press release, debarment hearing and debarment, a jury could infer that the District's staff

32

initiated charges to further the Trustees' agenda of retaliating against the FTR Parties for Katbi's speech.[18]

The Trustees aver that FTR's claim is baseless because there is no evidence that they were aware of the letter. We note, however, that the letter was addressed to the attention of each individual Trustee. A jury would be entitled to infer that the Trustees knew of the letter.

Our task is to determine whether the FTR Parties' claim has minimal merit. (*Oasis West Realty, LLC v. Goldman* (2011) 51 Cal.4th 811, 820 [only a cause of action that arises from protected speech and "lacks even minimal merit—is a SLAPP"]; *Navellier*, *supra*, 29 Cal.4th at p. 89; *Soukup v. Law Offices of Herbert Hafif* (2006) 39 Cal.4th 260, 278–279.)[19] Based on the law and the state of the evidence, there is enough to suggest First Amendment retaliation.

4. *Defenses*.

Even if they retaliated against the FTR Parties, the Trustees contend that they have two defenses. At this stage of the proceedings, we cannot concur.

If a plaintiff makes a sufficient showing of retaliation, then the burden shifts to the government to show that it had an adequate justification for treating the plaintiff differently from other members of the general public, or that it would have taken the adverse action even absent the protected speech. (*Robinson v. York* (9th Cir. 2009) 566 F.3d 817, 822.) The first defense is based on the balancing test in *Pickering v. Board of Education* (1968) 391 U.S. 563, 568 (*Pickering*), and the second defense is based on

---

[18]    In light of our conclusion that the evidence supported a retaliation claim based on Katbi's letter, we need not consider FTR's alternative contention that the Trustees retaliated based on statements made by FTR at the debarment hearing.

[19]    Because they have not cited any supporting law, we are unmoved by the Trustees' suggestion that FTR should be estopped from relying on the letter in support of its claim because it did not submit the letter when it sought to enjoin the debarment hearing, and because the FAC did not allege that the letter prompted bias in the Trustees. (*Nelson v. Avondale Homeowners Assn.* (2009) 172 Cal.App.4th 857, 862 ["'When an appellant fails to raise a point, or asserts it but fails to support it with reasoned argument and citations to authority, we treat the point as waived'"].)

the mixed motive test in *Mt. Healthy City School District Board of Education v. Doyle* (1977) 429 U.S. 274, 287 (*Mt. Healthy*).

Pursuant to the *Pickering* defense, a court must balance the right of a person to make statements against the interest of the state, as an employer, in promoting the efficiency of the public services it performs. (*Rankin v. McPherson* (1987) 483 U.S. 378, 388.) "Application of this balancing test entails a factual inquiry into such matters as whether the speech (i) impairs discipline or control by superiors, (ii) disrupts co-worker relations, (iii) erodes a close working relationship premised on personal loyalty and confidentiality, (iv) interferes with the speaker's performance of her or his duties, or (v) obstructs the routine operation of the office. The 'manner, time, and place' in which the speech occurred also constitute relevant considerations." *(Rendish v. City of Tacoma* (9th Cir. 1997) 123 F.3d 1216, 1224–1225.) "Disruption must be 'actual, material and substantial,' not 'imagined.' [Citation.] However, the employer need not 'allow events to unfold to the extent that the disruption of the office and the destruction of working relationships is manifest before taking action.' [Citation.] 'When close working relationships are essential to fulfilling public responsibilities, a wide degree of deference to the employer's judgment is appropriate.' [Citation.]" (*Id.* at p. 1225; *Gray v. County of Tulare* (1995) 32 Cal.App.4th 1079, 1091–1095.) The "'state interest element of the test focuses on the effective functioning of the public employer's enterprise. Interference with work, personnel relationships, or the speaker's job performance can detract from the public employer's function; avoiding such interference can be a strong state interest.' [Citation.]" (*Id.* at p. 1092.)

Below, the Trustees did not raise either the *Pickering* or *Mt. Healthy* defenses. On appeal, they cite no evidence establishing that speech such as Katbi's letter disrupts the District's offices, destroys working relationships, etc. Nor do they cite evidence that they would have taken the same action regardless of whether they harbored a retaliatory motive. We conclude that the Trustees failed to establish that either of these defenses apply. (*Hepner v. Franchise Tax Bd.* (1997) 52 Cal.App.4th 1475, 1486 [points not raised in the trial court will not be considered].)

34

### 5. *Qualified Immunity.*

The Trustees argue that they are entitled to qualified immunity because there was no clearly established indication that the discretionary decision to vote to debar the FTR Parties violated any constitutional rights. This argument misstates the issue. The issue is whether it was clearly established that Katbi's letter addressed an issue of public concern, and that it was unconstitutional to debar the FTR Parties in retaliation for Katbi's exercise of his First Amendment rights in that letter.

Here, the Trustees had fair warning at the time they voted to debar the FTR Parties that it could not do so in retaliation for Katbi's letter. Case law established that independent contractors enjoy First Amendment protection (*Bd. of County Comm'rs v. Umbehr* (1996) 518 U.S. 668, 685 (*Umbehr*)), and that speech addresses a matter of public concern if it relates to any matter of political, social or other concern to the community such as corruption, wrongdoing or misconduct by government agents, or if it was a subject of legitimate news interest. (*Sydner*, *supra*, 562 U.S. at p. 452; *Alpha*, *supra*, 381 F.3d at p. 926.) It also established that a public official cannot retaliate against a public contractor for exercising its First Amendment rights. (*Id*. at p. 923; *Umbehr*, *supra*, 518 U.S. at p. 685 [a public entity cannot terminate a preexisting relationship with an independent government contractor in retaliation for exercising First Amendment rights].)

### 6. *Absolute Immunity.*

Under federal jurisprudence, judges have absolute immunity from suit under section 1983. (*Cleavinger v. Saxner* (1985) 474 U.S. 193, 199.) This immunity has been extended "to certain others who perform functions closely associated with the judicial process" such as lawyers and witnesses. (*Id*. at p. 200.) Per the language of *Butz v. Economou* (1978) 438 U.S. 478, 512 (*Butz*), absolute immunity is "necessary to assure that judges, advocates, and witnesses can perform their respective functions without harassment or intimidation."

Immunity is justified because the "safeguards built into the judicial process tend to reduce the need for private damages actions as a means of controlling unconstitutional

conduct.  The insulation of the judge from political influence, the importance of precedent in resolving controversies, the adversary nature of the process, and the correctability of error on appeal are just a few of the many checks on malicious action by judges.  Advocates are restrained not only by their professional obligations, but by the knowledge that their assertions will be contested by their adversaries in open court.  Jurors are carefully screened to remove all possibility of bias.  Witnesses are . . . subject to the rigors of cross-examination and the penalty of perjury.  Because these features of the judicial process tend to enhance the reliability of information and the impartiality of the decisionmaking process, there is a less pressing need for individual suits to correct constitutional error." (*Butz*, *supra*, 438 U.S. at p. 512.)

We conclude that the Trustees are not entitled to absolute immunity.  Unlike a judge, who would be subject to disqualification under Code of Civil Procedure sections 170.1 and 170.6 if he or she was biased against a party, the Trustees were not subject to disqualification.  The result in this case was that the Trustees, having authorized a lawsuit against FTR, were in the position of presiding over issues that they had arguably prejudged.  Prehearing discovery was not permitted.  A review of the committee's ruling and findings indicates that it lacked legal training and was essentially indifferent to legal precedent.  Instead of having a command of the legal issues presented, the committee relied heavily on Orbach and Goulet for guidance and therefore lacked the independence of thought that is the hallmark of judicial office.  Thus, we conclude that the debarment hearing lacked essential safeguards necessary to reduce the need for private damages actions as a means for controlling unconstitutional conduct.

Additionally, while a judge does no more than enforce the law or preside over disputes between third parties, the Trustees decided whether the District, as a consumer of construction services and a participant in the marketplace, would consider bids from the FTR Parties for five years.  In that sense, the Trustees did not perform a function that is closely associated with the judicial process.  A statement by Trustee Park during the hearing before the committee highlights the point.  She stated, "You know, we're not

36

lawyers; we're not judges here. We're trying to do the best . . . for our constituents in protecting the public works in our contracts."

The Trustees suggest that *Butz* and *Buckles v. King County* (9th Cir. 1999) 191 F.3d 1127 (*Buckles*) dictate a finding of absolute immunity. We disagree because they are materially distinguishable. At issue in *Butz* was an administrative hearing conducted before a hearing officer who was enforcing the law rather than deciding whether a public entity would enter into future public contracts with a defendant. Unlike the Trustees, who are appointed, the hearing officer in *Butz* was insulated from political influence. Last, the parties in *Butz* had a right that the FTR Parties did not have, i.e., the parties in *Butz* were entitled to know the findings and conclusions on all of the issues of fact, law and discretion. (*Butz*, *supra*, 438 U.S. at pp. 512–513.) The proceedings in *Buckles* reflected "the same characteristics of the judicial process identified as sufficient in *Butz*." (*Buckles*, *supra*, 191 F.3d at p. 1134.) Also, the procedures in *Buckles* provided "for disqualification of the Board members for bias and prejudice." (*Id*. at p. 1134.) No such procedure was available here.

## V. The Official Capacity Section 1983 Claims; the Taxpayer Claim.

Pursuant to taxpayer claim in the FAC, the FTR Parties sought to enjoin the District from unlawfully debarring the FTR Parties and violating its state and federal constitutional rights.[20] As well, the FAC alleged: "There is an actual controversy between plaintiffs and defendants concerning their respective rights and duties in that plaintiffs contend that the policies and practices of defendants . . . are in violation of state and federal law and contrary to the factual circumstances, as alleged herein, whereas defendants contend in all respects to the contrary."

---

[20] Code of Civil Procedure section 526a provides in relevant part: "An action to obtain a judgment, restraining and preventing any illegal expenditure of, waste of, or injury to, the estate, funds, or other property of a county, town, city or city and county of the State, may be maintained against any officer thereof, or any agent, or other person, acting in its behalf, either by a citizen resident therein, or by a corporation, who is assessed for and is liable to pay, or, within one year before the commencement of the action, has paid, a tax therein."

In the procedural due process claim in the FAC, the FTR Parties were seeking relief that would enjoin the Trustees from "engaging in each of the unlawful practices, policies, customs and usages" alleged, and from "using any of the charges or accusations asserted in the debarment proceeding to take any negative actions against [the FTR Parties], including but not limited to initiating further debarment proceedings . . . , seeking to label [the FTR Parties] . . . as 'non-responsible' bidders with respect to any [District] projects, invoking the 'convenience' clause to terminate any outstanding contract, or making any public or official statements [about the FTR Parties] or any of their agents or principals[.]"

The TAC requested the same relief. Thus, the relief was requested in part due to the First Amendment retaliation claim.

Fairly understood, the taxpayer and official capacity claims arise out of the debarment hearing, the debarment and the termination of FTR's contracts. These were acts of governance by the District. Applying the anti-SLAPP statute to these types of acts would chill challenges to governmental action. Based on *San Ramon*, we hold that the anti-SLAPP statute does not apply.

## VI. The Interference Claims; the Negligence Claim.

The Trustees contend that the second anti-SLAPP motion should have been granted as to the state tort claims because they are immune from liability under Government Code sections 820.2 and 820.9.

We agree.

A. <u>Immunity for Act of Discretion</u>.

"Except as otherwise provided by statute, a public employee is not liable for an injury resulting from his act or omission where the act or omission was the result of the exercise of the discretion vested in him, whether or not such discretion be abused." (Gov. Code, § 820.2.)

The FTR Parties argue that the Trustees' decision to debar nonresponsible bidders is not discretionary. We cannot concur. Pursuant to Public Contract Code section 20651, subdivision (b), the governing board of a community college district must award a

contract for a public project to the lowest responsible bidder. The District has discretion to determine which bidders are responsible. (*Stacy & Witbeck, Inc. v. City and County of San Francisco* (1995) 36 Cal.App.4th 1074, 1094, fn. 9 ["municipalities have discretion to determine which bidders are 'responsible'"].) Debarment is "a necessary means to enable the contracting governmental agency to deal with irresponsible bidders and contractors, and to administer its duties with efficiency. [Citation.]" (*Golden Day*, *supra*, 83 Cal.App.4th at p. 704.) Viewed properly, debarment is not an obligation; it is a discretionary tool at the District's disposal.

Regardless of whether the debarment was discretionary, the FTR Parties contend that it does not fall within Government Code section 820.2 because it was an operational decision rather than a policy decision.

Under California common law, a governmental official had "personal immunity from lawsuits challenging his or her discretionary acts within the scope of authority. [Citation.]" (*Caldwell v. Montoya* (1995) 10 Cal.4th 972, 979 (*Caldwell*) [holding that the votes by school board members not to renew the contract of a superintendant qualified as discretionary acts within the meaning of Gov. Code, § 820.2].) This immunity protected an official even if he or she acted with malice. (*Caldwell*, *supra*, 10 Cal.4th at p. 979.) When the Legislature enacted the Tort Claims Act, it codified the traditional immunity for discretionary acts in Government Code section 820.2. (*Caldwell*, *supra*, at p. 980.) Our Supreme Court explained that the "immunity is reserved for those *basic policy decisions* which have . . . been [expressly] committed to coordinate branches of government[.]" (*Caldwell*, *supra*, at p. 981.) In contrast, "there is no basis for immunizing lower-level, or 'ministerial,' decisions that merely implement a basic policy already formulated. [Citation.]" (*Ibid.*) Consequently, "immunity applies only to *deliberate and considered* policy decisions, in which a '[conscious] balancing [of] risks and advantages . . . took place. The fact that an employee normally engages in "discretionary activity" is irrelevant if, in a given case, the employee did not render a considered decision. [Citations].' [Citation.]" (*Ibid.*) Boiled down, case law distinguishes between "policy and operational judgments." (*Ibid.*)

39

Five years after *Caldwell*, our Supreme Court decided *Barner v. Leeds* (2000) 24 Cal.4th 676, 684.  In that case, the court held that Government Code section 820.2 could not be asserted as a defense to a claim that a deputy public defender committed legal malpractice.  (*Id*. at pp. 679–680.)  The opinion rested on the premise that "the acts or omissions of a deputy public defender in representing a defendant in a criminal action do not involve the type of basic policy decisions that are insulated from liability[.]" (*Ibid*.)

Our attention now switches to the world of public contracts.

Citing a string of cases and Government Code section 820.2, *Pacific Architects Collaborative v. State of California* (1979) 100 Cal.App.3d 110, 121 (*Pacific Architects*), stated, "Insofar as the decision not to award [a] contract was based on the exercise of discretion by the state employees, governmental immunity precludes the imposition of any liability based on a tort theory.  [Citations.]"  The court added that the "determination of the identity of the lowest responsible bidder [citation] and the decision of whether to award the contract to any of the bidders or reject all bids [citation] involves the exercise of discretion[,]" and Government Code section 820.2 applies.  (*Pacific Architects*, *supra*, 100 Cal.App.3d at p. 189.)  In *Curcini v. County of Alameda* (2008) 164 Cal.App.4th 629 (*Curcini*), the court held that the decision to reject all bids for a chaplain services contract at a jail was protected by Government Code section 820.2.  *Curcini* relied, in part, on *Monterey Mechanical Co. v. Sacramento Regional County Sanitation Dist.* (1996) 44 Cal.App.4th 1391, 1413, which stated, "Because the award of a public contract involves the exercise of discretion, the government employees and entities involved are immune from liability."

Under scrutiny now is debarments.

As explained in *Taylor Bus Service, Inc. v. San Diego Bd. of Education* (1987) 195 Cal.App.3d 1331, 1341–1342, "A determination that a bidder is responsible is a complex matter dependent, often, on information received outside the bidding process and requiring, in many cases, an application of subtle judgment.  Not only is the process

complex, but the declaration of nonresponsibility may have an adverse impact on the professional or business reputation of the bidder."

In the words of *Golden Day*, "Debarment is never a matter of small moment." (*Golden Day*, *supra*, 83 Cal.App.4th at p. 703.) Quoting a federal case dating back to 1970, *Golden Day* adopted the recognition that the consequences of debarment "'will vary, depending upon multiple factors: the size and prominence of the contractor, the ratio of his government business to non-government business; the length of his contractual relationship with government; his dependence on that business; his ability to secure other business as a substitute for government business. . . . The impact of debarment on a contractor may be a sudden contraction of bank credit, adverse impact on market price of shares of listed stock, if any, and critical uneasiness of creditors generally, to say nothing of "loss of face" in the business community. These consequences are in addition to the loss of specific profits from the business denied as a result of debarment.'" (*Id*. at pp. 703–704.)

Based on the foregoing authorities, we conclude that the Trustees' decision to debar the FTR Parties involved a discretionary policy decision as to whether to trust the FTR Parties with public projects and millions of dollars for five years. The decision required the Trustees to form a considered opinion about the impact of debarring or not debarring the FTR Parties on the District and its existing contracts. Other than requiring a fair hearing before a debarment, it would be unseemly for courts to interfere in the District's debarment decisions (*Caldwell*, *supra*, 10 Cal.4th at p. 981) because a debarment occurs at the planning stage, i.e., it constitutes a plan regarding who will or will not be eligible to build public projects. If the decision not to award a public contract is protected by immunity, as established in *Pacific Architects* and *Curcini*, then certainly the decision to debar a contractor and not award any contracts to that contractor for a set period of time is protected by immunity.[21]

---

[21] Moreover, we find no meaningful distinction between this case and *Ogborn v. City of Lancaster* (2002) 101 Cal.App.4th 448. There, the court held that a public official charged with administering a city's nuisance abatement program was entitled to

41

B. <u>Immunity for Act of a Public Entity</u>.

Government Code section 820.9 provides in relevant part that "members of governing boards of . . . local public entities . . . are not vicariously liable for injuries caused by the act or omission of the public entity or advisory body. Nothing in this section exonerates an official from liability for injury caused by that individual's own wrongful conduct." (Gov. Code, § 820.9.) A local public entity "includes a county, city, district, public authority, public agency, and any other political subdivision or public corporation in the State, but does not include the State." (Gov. Code, § 900.4.) Under these statutes the District is a local public entity, and the Trustees are therefore members of a governing board of a local public entity.

We conclude that the Trustees are entitled to immunity. The disruption of FTR's contracts and relationships was caused by the debarment, which was an action taken by the District. Through its interference claims, the FTR Parties seek to hold the Trustees vicariously liable for the District's action.

The FTR Parties urge us to conclude that the Trustees are being sued not for the debarment by the District but for their own wrongful conduct in casting votes designed to debar them without procedural due process and in retaliation for Katbi's exercise of First Amendment rights. We decline. "Courts are reluctant to attribute to the Legislature an intent to create 'an illogical or confusing scheme' [citation]; legislative policy is best effectuated by avoiding those constructions which lead to mischief or absurdity." (*People v. Jeffers* (1987) 43 Cal.3d 984, 998–999.) If we were to construe the statute as the FTR Parties suggest, then the exception would swallow the rule. Even if the members of governing boards could not be sued for the acts of local public entities, they could be sued for causing those acts, and their exposure to liability would be no different than if the immunity provided in Government Code section 820.9 did not exist.

---

immunity after "making the discretionary policy decision to declare [a property] a nuisance." (*Id*. at p. 461.) Debarring a contractor is no less a policy decision than declaring that a nuisance exists.

## VII.  Attorney Fees.

Subdivision (c)(1) of the anti-SLAPP statute provides that if the trial court "finds that a special motion to strike is frivolous or is solely intended to cause unnecessary delay, the court shall award costs and reasonable attorney's fees to a plaintiff prevailing on the motion, pursuant to [Code of Civil Procedure] Section 128.5."  Based on this statutory provision, the trial court awarded attorney fees.  This was error.

Code of Civil Procedure section 128.5, subdivision (b)(2) defines frivolous to mean "totally and completely" without merit, or for the "sole" purpose of harassing the opposing party.  "When a motion has partial merit, it is not 'totally and completely' without merit, nor can it be said that its 'sole' purpose is to harass."  (*Gerbosi v. Gaims, Weil, West & Epstein, LLP* (2011) 193 Cal.App.4th 435, 450.)[22]

This opinion establishes that the first anti-SLAPP motion should have been granted as to the personal capacity due process claim.  Thus, the motion had at least partial merit, and it was not frivolous.

## VIII.  The Trial Judge.

The Board and Trustees request that we "consider whether in the interests of justice [we] should direct that further proceedings be heard before a trial judge other than" the trial judge who ruled on their motions.  (Code Civ. Proc., § 170.1, subd. (c).)  They contend that disqualification is mandated because the trial judge demonstrated animus inconsistent with judicial objectivity and, therefore, a reasonable man would entertain doubts concerning the trial judge's impartiality.  (*People v. Enriquez* (2008) 160

---

[22]    The FTR Parties suggest, and the trial court found, that the frivolous nature of the first anti-SLAPP motion is established, in part, because the District and Trustees violated a stipulation.  After the FAC was filed, the parties stipulated to an extension of the deadline for the District and Trustees to file any pleading responsive to the FAC.  In addition, the FTR Parties were given until the deadline to file a second amended complaint.  On the same day the stipulation was signed, and without notice to the FTR Parties, the District and Trustees filed the first anti-SLAPP motion seeking an order striking the FAC.  The trial court found that this action raised the inference that the sole purpose of the motion was to harass.  Given that the motion had partial merit, any such inference is negated.

43

Cal.App.4th 230, 244.)  After reviewing the record, we conclude that this is not one of those rare cases where the trial judge should be disqualified.

All other issues raised by the parties are moot.

## DISPOSITION

The orders denying the anti-SLAPP motions are reversed in part and affirmed in part.  On remand, the trial court is instructed to grant the motions as to the personal capacity claim under section 1983 for the denial of procedural due process, the claim for intentional interference with contract and/or prospective economic advantage, and the claim for negligence.  Under section 1983, the official capacity claims for denial of procedural due process and First Amendment retaliation as well as the personal capacity claim for First Amendment retaliation may proceed.  So, too, can the taxpayer claim under Code of Civil Procedure section 526a.  The award of attorney fees in connection with the first anti-SLAPP motion is reversed.

The parties shall bear their own costs on appeal.

NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS.


_____, Acting P. J.
          ASHMANN-GERST


We concur:


_____, J.
      CHAVEZ


_____, J.
      HOFFSTADT


44